# LICENSE AGREEMENT

THIS AGREEMENT is made and entered into this 22 day of August, 1997, by and between The Stroh Brewery Company, an Arizona corporation located and having a place of business at 100 River Place, Detroit, MI 48207 (hereinafter called "Licensor") and Rheingold Brewing Company LLC, a Connecticut limited liability company located at 1771 Post Road East, Suite 236, Westport, CT 06880 (hereinafter called "Licensee").

## WITNESSETH:

WHEREAS, Licensor is the owner of exclusive rights in the marks listed in Exhibit A attached hereto and incorporated herein (hereinafter collectively, the "Mark") for beer; and

WHEREAS, Licensee is in the business of marketing, distributing and selling beer products, and desires to obtain a license from Licensor to use the Mark upon, and in connection with the manufacture, distribution, sale, and advertising of said products (hereinafter called "Licensed Product").

NOW, THEREFORE, for and in consideration of the mutual covenants and undertakings of the parties hereinafter set forth, the parties hereto agree as follows:

## GRANT

1. (a) Licensor hereby grants to Licensee an exclusive license and right to use the Mark to identify only the Licensed Product and in connection with the manufacture, distribution, sale, advertising, and promotion of the Licensed Product, including ancillary products used in marketing and merchandising the Licensed Product, subject to the provisions, conditions, and limitations set forth in this Agreement. Licensee shall also have the right under this Agreement to use the Mark as part of its assumed business name, e.g., Rheingold Brewing Company, for so long as this agreement remains in effect.

    (b) The Territory covered by this grant is worldwide.

    (c) Licensee acknowledges that its violation of any of the covenants of this Agreement relating to the use of the Mark, or its failure to observe any of the limitations upon the license herein granted, will result in immediate and irreparable damage to Licensor. Licensee admits that there is no adequate remedy at law for such violation or failure, and agrees that in the event of such violation or failure Licensor shall be entitled to equitable relief by way of temporary and permanent injunctions and to such other relief as any court with jurisdiction may deem just and proper.

-1-

## TERM

2. (a) The period during which this Agreement shall be in effect is the term starting on the date this Agreement is executed by both parties, and ending 99 years from said date, unless terminated earlier as provided for herein. At the expiration of such term, Licensee shall have an option, exercisable in writing six months prior to the end of the term, to extend the term for an additional 99 year period. Should Licensee fail to sell a minimum of 2,000 barrels of the Licensed Product in the third year of this Agreement, or in any subsequent year, Licensor may, at its option, terminate the term of this Agreement by written notice to Licensee within sixty (60) days following the end of the third year or in any other subsequent year.

(b) Licensee shall not be deemed in default or otherwise liable hereunder due to its inability to perform by reason of any fire, earthquake, flood, epidemic, accident, explosion, casualty, strike, lockout, labor controversy, riot, civil disturbance, act of public enemy, embargo, war, act of God, or any municipal, county, state, national or international ordinance or law or any executive, administrative, judicial or similar order (which order is not the result of any act or omission to act which would constitute a default under this Agreement), or any failure or delay of any transportation, power or other essential thing required, or similar causes beyond Licensee's control. Immediately upon the occurrence of such an event, Licensee shall notify Licensor of its attendant inability to perform hereunder. Any delay in performance shall be no greater than the event of force majeure causing the delay. If an event of force majeure continues uninterrupted for a period exceeding twenty-four (24) consecutive months, either Party may elect immediately to terminate this Agreement upon notice to the other, but such right of termination, if not exercised, shall expire immediately upon the discontinuance of the event of force majeure.

## ROYALTY

3. (a) In consideration of the license granted herein, Licensee shall pay Licensor royalties in accordance with the royalty schedule set forth below:

Royalty per bbl. shipped (net of returns):

| Year | Royalty |
|------|---------|
| 1998 | $2.00 |
| 1999 | $2.00 |
| 2000 | $2.00 |
| 2001 | $2.00 |
| 2002 | $2.00 |
| 2003 | $2.50 |
| 2004 | $2.50 |
| 2005 | $2.75 |
| 2006 | $2.75 |
| 2007 | $3.00 |
| 2008+ | $3.00 |

All royalties shall be paid within 45 days of the end of each calendar year quarter.

-2-

(b) The Royalty Payment for sales by Licensee to parties outside the United States, its territories and possessions, shall be $10.33 per barrel.

## TRADEMARK USE

4. (a) Licensee acknowledges and confirms Licensor's ownership of the Mark as well as its validity. Licensee further acknowledges and confirms the Licensee will not at any time put in issue the validity of the Mark or challenge Licensor's ownership or rights in the Mark or Licensor's authority to enter into this Agreement with Licensee. Licensee represents and acknowledges that all use of the Mark hereunder shall inure to the benefit of Licensor.

(b) Copyright, trademark or other protection relating to the Mark may be obtained only by Licensor at its own expense. Licensee will fully cooperate with Licensor in any action by Licensor for protection of such rights and shall furnish Licensor with all information and specimens which it may require for use in procuring the same. Should Licensee desire to sell the Licensed Product in a particular country, it shall so notify Licensor, and Licensor shall apply to register the mark in such country if it has not already done so.

(c) Licensor warrants and represents that the trademark registrations set forth on Exhibit A are in full force and effect and in good standing, and further agrees to maintain such registrations in full force and effect for so long as this Agreement remains in effect. Licensor further represents that to the best of its knowledge there are no presently pending suits, claims or encumbrances that could or will jeopardize the good standing of the Mark or the Mark's registrations, or Licensee's ability to use the Mark in its exercise of its rights hereunder. Should any party assert a claim, suit or action challenging the validity of the Mark or Licensee's ability to use the Mark, Licensor will defend such claim, suit or action at its own cost, and Licensee will cooperate in the defense of same.

## PRODUCTION, PROMOTION, SALE AT LICENSEE'S INSTANCE AND EXPENSE

5. (a) Except as otherwise provided in this Agreement, or as the parties may otherwise agree, the manufacture, distribution, advertising, promotional activity, and sale of the Licensed Product shall be at Licensee's sole cost and expense and at no cost and expense to Licensor. Accordingly, Licensee represents and agrees that Licensee will pay all the costs and expenses, losses, liabilities, and judgments that may be associated with or arise from Licensee's manufacture, distribution, and sale of the Licensed Product, except as otherwise provided herein.

(b) Licensee shall be responsible for the manufacture, distribution, advertising, promotional activity and sale of the Licensed Product. All activities relating to the advertising, promotion, sale and distribution of the Licensed Product shall be consistent with the image of the Licensed Product as a quality beer brand. Upon Licensor's reasonable request, no more than once per contract year, Licensee will review its

marketing plan for the Licensed Product with Licensor and will consult with Licensor as to the Licensee's marketing activities. Licensee shall have ultimate responsibility for implementing and executing all marketing activities. Licensee shall have the right to introduce line extensions under the Mark as part of any such marketing plan.

(c) Licensee shall position the Licensed Product as a high quality premium brand on a long term basis. Licensee shall advertise, promote and sell the Licensed Product consistent with such positioning.

(d) Licensee shall produce the Licensed Product through a contract brewer. Such contract brewer shall be a brewer qualified to produce the Licensed Product to the strict standards established for the Licensed Product. Following the end of the third year of this Agreement, Licensor shall have the option to become the contract brewer for the Licensed Product at a contract brewing fee net of ingredient and packaging costs at least 10% below the fee charged to the Licensee by the previous contract brewer. In the event Licensor exercises such option, it shall charge Licensee for materials related to the production of the Licensed Product at Licensor's cost, including all relevant volume discounts and chargebacks that Licensor receives from suppliers or otherwise. To the extent Licensor is required to make any changes in its production line in order to brew the Product, it shall bear the cost of any such changes. Notwithstanding the foregoing, should at any time Licensee become the owner or otherwise control a brewing facility, it shall have the right to produce the Licensed Product at such brewery, for as long as it continues to own or control the brewery, provided that should Licensee need to terminate any existing contract brewing agreement or arrangement with Licensor it shall do so in accordance with the terms and conditions of such agreement or arrangement.

(e) To the extent available to Licensor, Licensor shall make available to Licensee any historical materials or copies of historical materials relating to the Licensed Product, including any advertising and promotional materials formerly used by Licensor or its predecessors, marketing materials, packaging materials and brewing records. To the extent Licensor owns or has the right to use any such materials, it will make available such materials to Licensee for use in manufacturing, marketing, advertising and promoting the Licensed Product. Licensee shall pay the costs of any insurance or special handling charges that may be associated with the transport and delivery of such materials to Licensee and for the return to Licensor.

(f) Licensor has notified most of its distributors that it has discontinued the Licensed Product. Licensor has provided or will, within 30 days of its execution of this Agreement, provide Licensee with (1) a list of those former distributors of Rheingold beer products that were authorized to distribute such products as of the date Licensor discontinued production of the products, along with true copies of contracts with such distributors that can be reasonably located by Licensor, (2) a list of all former distributors of Rheingold beer products who received notice from Licensor of the discontinuation of such products, along with copies of all letters or notices to distributors informing them that such products have been discontinued, (3) a list of former distributors of Rheingold beer

-4-

products that have been sent revised contracts by Licensor removing authorization to distribute Rheingold beer products, such list to also indicate which former distributors have executed such revised contracts, and (4) other reasonable assistance to Licensee with respect to information concerning former distributors of Rheingold beer products. Licensor is, to the best of its knowledge, not aware of any claims by former distributors of Rheingold beer products with regard to their alleged right to continue to distribute such products, or otherwise contesting the discontinuance of such products. Licensee shall be exclusively responsible for selecting and appointing distributors for the Licensed Product.

RELATIONSHIP OF THE PARTIES

6.  It is the intention of the parties to enter into a licensing agreement only and nothing herein contained shall be construed to regard the parties as being partners or joint venturers, or to constitute the arrangement herein provided for as a partnership or joint venture.

INFRINGEMENT BY OTHERS

7.  Licensee shall notify Licensor of any such products or items of similar nature to the Licensed Product or any ancillary or related products which embody, in any way, the Mark, or any trademarks confusingly similar to the Mark which come to Licensee's attention. Licensor shall have the sole right to determine whether or not any action shall be taken against such infringement and Licensee shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of Licensor to do so. Licensor shall take action against such infringements at its own cost and expense.

INDEMNITY

8.  (a)  Licensee agrees to indemnify and hold harmless Licensor against any and all claims, causes of action, suits, damages, liabilities, and/or judgments and settlements including all costs, expenses, and attorney's fees based upon and arising out of the Licensee's manufacture, distribution, promotion, and sale of the Licensed Product, or packaging, distribution, and/or advertising materials relating thereto. Licensee shall undertake to conduct the defense of any such suit at its own expense, it being understood, however, that Licensor has at all times the option to participate in, or undertake any litigation involving said matters through counsel of its own selection and at its own expense, subject to the indemnity and hold harmless obligations of Licensee hereunder with respect to such expense. Licensee shall not make any settlement of any claim, suit, or demand for which Licensor may become responsible hereunder without Licensor's written consent which shall not be unreasonably withheld. The indemnity, hold harmless, and defend provisions of this Agreement shall survive its termination or expiration.

(b)  Licensor agrees to indemnify and hold harmless Licensee against any and all claims, causes of action, suits, damages, liabilities and/or judgments and

settlements including all costs, expenses and attorney's fees based upon and arising out of or resulting from any actual or alleged trademark infringement made by third parties, and Licensor shall have the right to assume complete control of the defense of any such claim. Licensor shall further have the right to terminate this Agreement should termination be necessary to comply with a court order, or to settle, compromise or otherwise dispose of any such claim, demand or action for trademark infringement.

## INSURANCE

9. Through the life of this Agreement Licensee shall maintain product liability insurance in the following amounts:

Comprehensive General Liability:

| | |
|---|---|
| Bodily Injury | $1,000,000 each person |
| | $1,000,000 each occurrence |
| Property Damage | $1,000,000 each occurrence |
| | $1,000,000 aggregate |
| Comprehensive Liability | $1,000,000 |

Licensee shall name Licensor as an additional insured under such policy. Alternatively, Licensor may be named as an additional insured under a policy of insurance maintained by Licensee's contract brewer meeting the same policy limits.

## TERMINATION

10. (a) In the event the Licensee shall at any time fail to make payments or otherwise abide by the conditions herein, Licensor shall have the right to notify Licensee of such default and its intention to terminate this Agreement unless such default is corrected by Licensee within sixty (60) days from the date of mailing of such notice. Licensor and Licensee shall, within ten (10) days of Licensee's receipt of such notice, discuss in good faith how such default might be cured, and such discussions shall include the possibility of extending the period in which such default shall be cured or modifying in a mutually satisfactory manner the requirements of the licensing arrangement. If the parties are unable to arrive at a mutually satisfactory solution, or if such default is not corrected within the aforementioned time period, or as such time period may be extended, Licensor shall be entitled, without prejudice to any of its other rights conferred by this Agreement, to terminate this Agreement at any time thereafter by sending a written notice of termination to Licensee to take effect immediately. Waiver by Licensor of any specific default or breach shall not be deemed to be a waiver of any other or subsequent default or breach.

(b) In the event that Licensee shall become insolvent, exercise an assignment for the benefit of creditors, go into liquidation, or a trustee is appointed for the benefit of creditors, whether any of the aforesaid events be the outcome of a voluntary act of Licensee or otherwise, Licensor shall be entitled to terminate this Agreement forthwith by giving notice to such effect to Licensee.

(c) The termination of this Agreement for any reason shall be without prejudice to any of each party's rights under this Agreement.

(d) Notwithstanding termination of this Agreement, the parties shall be required to carry out any provisions hereof which contemplate performance by them subsequent to such termination and such termination shall not affect any liability or other obligations which shall have accrued prior to such termination, specifically including the payment of accrued royalties.

(e) In the event of termination of this Agreement or upon its expiration according to the terms hereof, Licensee shall immediately discontinue all use of the Mark and all trademarks belonging to Licensor and all rights to use such trademarks shall automatically revert to Licensor and Licensee shall promptly execute any and all documents reasonably required by Licensor in connection with such discontinuance and reversion. Notwithstanding the foregoing, Licensee shall have the right to dispose of any then existing inventory of the Licensed Product during but not after the three (3) month period immediately following the date of such termination or expiration.

## ASSIGNMENTS

11. This Agreement shall be binding upon and inure to the benefit of subsidiaries, affiliates, successors, and assigns of the parties hereto. This Agreement shall not be assigned or sublicensed by Licensee without the prior written consent of Licensor, except that the Agreement may be assigned as part of the sale of Licensee's entire company, or a controlling interest therein. In the event Licensee desires to sell its company or controlling interest therein, it shall first offer to sell such interest to Licensor. If after forty-five (45) days the parties have not concluded an agreement, Licensee may offer to sell such interest to a third party.

## GOVERNING LAW

12. This Agreement shall be construed and governed in accordance with the laws of the State of New York.

## NOTICES

13. All notices and payments provided for in this Agreement shall be given or made by personal delivery or by certified mail return receipt requested to the addresses set

09/07/2007  04:38   2123633313         S. GOPSTEIN                    PAGE 09

forth above for each party to this Agreement, or to such other address as may be designated in writing by each party to the other from time to time. If given or made by personal delivery, notices and payments shall be effective on the date of personal delivery and, if given or made by certified mail return receipt requested, they shall be effective on the date of mailing unless otherwise provided herein.

### ENTIRE AGREEMENT

14. This Agreement contains the entire understanding of the parties with respect to the subject matter herein contained. The parties may, from time to time during the continuance of this Agreement, modify, vary, or alter any of the provisions of this Agreement but only by an instrument duly executed by both parties hereto. All provisions of this Agreement shall be severable and no such provision shall be affected by the invalidity of any other provisions. This Agreement shall be interpreted and enforced as if all invalid provisions were not contained herein.

### AUTHORITY OF SIGNERS

15. The individuals who sign this Agreement on behalf of the respective parties hereby represent and warrant that they have the right, power, legal capacity and appropriate corporate authority to enter this Agreement on behalf of the corporation or party for which they sign below.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date and year first written above.

LICENSOR
The Stroh Brewery Company

Date: 8/22/97

By: _____
Title: E.V.P. - CFO

LICENSEE
The Rheingold Brewing Company, LLC

Date: 8/20/97

By: _____
Title: President

-6-

## EXHIBIT A

RHEINGOLD (U.S. Trademark Registration No. 632,824 dated 8/14/56)

RHEINGOLD (U.S. Trademark Registration No. 320,606 dated 1/01/35)

## ADDENDUM NO. 1 TO LICENSE AGREEMENT

THIS ADDENDUM NO. 1 effective the __27__ day of __August__, 1997 to the License Agreement, made and entered into on the __22__ day of __August__, 1997 by and between The Stroh Brewery Company ("Licensor") and The Rheingold Brewing Company, LLC ("Licensee") (the "License Agreement").

### WITNESSETH:

WHEREAS in connection with the License Agreement, the parties desire to add certain provisions regarding the keeping of books and accounts;

NOW THEREFORE, the parties further agree to the following, all other terms and conditions of the License Agreement remaining unchanged:

1. Licensee shall keep accurate accounts and records of all transactions covered by this Agreement and shall allow Licensor, or its authorized representative, at Licensor's cost and no more than once every twelve (12) months, at reasonable business hours to examine all inventory, records, accounts or other documents in Licensee's possession relating to this Agreement in order to verify shipment quantities and resulting royalties due. Licensee agrees to retain its accounts and records of all transactions covered by this Agreement for at least four years beyond the current year to facilitate the resolution of any dispute in accounting.

All defined terms used herein shall have the meaning ascribed to them in the License Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be signed as of the date and year first written above.

LICENSOR

The Stroh Brewery Company

By: _____
Title: Exec VP

LICENSEE
The Rheingold Brewing Company, LLC

By: _Michael H. Mitter_
Title: President

## AMENDMENT NO. 1 TO LICENSE AGREEMENT

This Amendment No. 1 is made and entered into this _13th_ day of _January_, 1998, amending the License Agreement dated the 22nd day of August, 1997 by and between The Stroh Brewery Company ("Licensor") and Rheingold Brewing Company LLC ("Licensee"), (the "License Agreement").

1.   The third sentence of Section 2(a) shall be amended to read as follows:

"Should Licensee fail to sell a minimum of 2,000 barrels of the Licensed Product in calendar year 2000, or in any subsequent year, Licensor may, at its option, terminate this Agreement by written notice to Licensee within sixty (60) days of the end of said calendar year 2000 or in any other subsequent year."

2.   Section 5(d) shall be amended in its entirety to read as follows:

"Licensee shall produce the Licensed Product through a contract brewer. Such contract brewer shall be a brewer qualified to produce the Licensed Product to the strict standards established for the Licensed Product. Licensor shall have the option to become the contract brewer for the Licensed Product, subject to the termination provisions of Licensee's existing production contract, with Licensor's effective initial production date January 1, 2001 but no later than May 15, 2001 (the "Option to Brew"), subject to the following terms:

(1) Licensor shall provide Licensee written notice of its intent to exercise the Option to Brew by certified mail, return receipt requested, no later than July 31, 2000, accompanied by a contract production fee and charges quote as set forth in subsections (2) and (3) below. If Licensor fails to provide notice to Licensee of its intent to exercise the Option to Brew by July 31, 2000, Licensor's Option to Brew shall expire and no longer be enforceable. The notice of the intent to exercise the Option to Brew shall be subject to and contingent upon the agreement of the parties on a contract production fee and product charges;

(2) Licensor shall quote Licensee a contract production fee that is at a minimum ten percent (10%) below the brewing fee of Licensee's then current contract producer (the " Prior Brewing Fee");

(3) Licensor shall also quote product charges to Licensee which shall be no greater than the product charges for packaging materials, product ingredients, variable labor and variable overhead costs of Licensee's then current contract producer (the "Prior Product Charges");

(4) In order to determine that Licensor's contract production fee and product charges are within the cost parameters set forth above, within five (5) days of the date of the notice of Licensor's intent to exercise its Option to Brew, Licensor and Licensee shall each designate an unrelated third party quote evaluator (the "Evaluators") to review and confer as to Licensor's proffered brewing fee and product charges quotes. Without divulging to Licensor Licensee's Prior Brewing Fee and Prior Product Charges, the Evaluators shall advise Licensor if its quotes are within the given parameters. If Licensor is advised that its quotes are not within the given parameters, Licensor shall have up to four (4) opportunities to revise its quotes up or down until they are within the parameters. The parties agree to complete the quote evaluation process by no later than August 15, 2000.

In the event Licensor exercises its Option to Brew, Licensee shall transfer production of the Licensed Product in increments of not less than 50,000 barrels of volume on an annual basis unless Licensor agrees in writing to a lesser amount. To the extent Licensor is required to make any changes in its production facilities in order to brew the Licensed Product, Licensor shall bear the cost of such changes. At any time subsequent to receipt of Licensor's notice of its intent to exercise its Option to Brew, Licensee may nevertheless source all or any part of its production with another brewer, provided that Licensee shall pay Licensor sixty five cents ($0.65) per barrel royalty on all production not sourced with Licensor, such payment to commence with production on or after January 1, 2001 and such payment to be in addition to the royalties payable in Section 3 Royalty of this License Agreement. Notwithstanding the foregoing, should at any time Licensee become the owner or otherwise control a brewing facility, Licensee shall have the right to produce the Licensed Product at such brewery, for as long as Licensee continues to own or control the brewery, provided that should Licensee need to terminate any existing contract brewing agreement or arrangement with Licensor it shall do so in accordance with the terms and conditions of such agreement or arrangement. The sixty five cent ($0.65) per barrel royalty payable to Licensor shall not apply to product brewed in Licensee's own production facility."

3. The second and third sentences of Section 11 shall be amended as follows:

"This Agreement shall not be assigned or sublicensed by Licensee without the prior written consent of Licensor, except that the Licensee may assign the Agreement without the prior written consent of the Licensor as part of the sale of (1) the Licensee's entire company, (2) all or substantially all of the company's assets, coupled with a dissolution of the company, or (3) a controlling interest in the company. In the event Licensee desires to sell pursuant to (1), (2) or (3) of this provision, Licensee shall first offer to sell such interests to Licensor."

All other terms and provisions of the License Agreement shall remain unchanged.

IN WITNESS WHEREOF, the parties have signed this Amendment No. 1 as of the date set forth above.

LICENSOR
The Stroh Brewery Company

By: *[signature]*
Title: V.P. CORPORATE PLANNING + DEVELOPMENT

LICENSEE
The Rheingold Brewing Company, LLC

By: *[signature]*
Title: President