David J. Sheehan, Esq.
Oren J. Warshavsky, Esq.
Jason S. Oliver, Esq.
**TROUTMAN SANDERS LLP**
The Chrysler Building
450 Lexington Avenue
New York, New York 10174

*Counsel for Plaintiff RBCI Holdings, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| RBCI HOLDINGS, INC. f/k/a RHEINGOLD BREWING COMPANY, INC., | *Document Filed Electronically* |
| Plaintiff, | CIVIL NO. 07-02877 (DC) |
| -against- | |
| DRINKS AMERICAS HOLDINGS, LTD., | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JASON S. OLIVER

Jason S. Oliver, Esq., of full age, hereby certifies as follows:

1.     I am an associate at the law firm of Troutman Sanders LLP, counsel for plaintiff RBCI Holdings, Inc. f/k/a/ Rheingold Brewing Company, Inc. (hereinafter "RBCI").

2.     As an attorney of record, I am fully familiar with this case and the facts set forth herein. I submit this Declaration to place before this Court true and correct copies of documents relevant to plaintiff RBCI's opposition to defendant Drinks Americas Holdings, Ltd.'s (hereinafter "Drinks") motion to dismiss the amended complaint in the above-captioned action.

3.      Attached hereto as Exhibit A is a true and correct copy of information pertaining to Rheingold Beer as downloaded from the Drinks Americas' corporate web site that is located at the uniform resource locator: http://www.drinksamericas.com/brands/rhein.htm (last visited October 2, 2007).

4.      Attached hereto as Exhibit B is a true and correct copy of the Amended Complaint filed by RBCI in the above-referenced action.

5.      Attached hereto as Exhibit C is a true and correct copy of the License Agreement entered into on August 22, 1997 between Rheingold Brewing Company LLC and The Stroh Brewing Company.

6.      Attached hereto as Exhibit D is a true and correct copy of the Asset Purchase Agreement entered into on October 27, 2005 between Rheingold Brewing Company, Inc. and Drinks Americas Holdings, Ltd.

Pursuant to 28 U.S.C. § 1746, I hereby declare that the foregoing statements made by me are true and correct.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: October 4, 2007
       New York, New York


                              s/ Jason S. Oliver
                              Jason S. Oliver, Esq.
                              Troutman Sanders LLP
                              The Chrysler Building
                              450 Lexington Avenue
                              New York, New York 10174
                              jason.oliver@troutmansanders.com

                              *Counsel for Plaintiff RBCI Holdings, Inc.*

# EXHIBIT A



DRINKS AME

**ABOUT**    **BRANDS**    **NEWS & EVENTS**    **MERCHANDISE**    **INVESTOR REL**



## Rheingold Beer



### "100 PERCENT NEW YORK BY VOLUME"

New York City's beer for over a century, Rheingold Beer beat the three leading domestic brands in multiple taste tests. Rheingold is full bodied with no bitterness and 5% alcohol by volume. It is lower in Carbs than Michelob Light (7.1g to Michelob's 11.7g) and lower in calories than Corona (125 to Corona's 150).

With a history as rich as its flavor, **Rheingold Beer IS New York**. Founded in Brooklyn in 1883, it was New York's #1 beer in the 40's, 50's, and 60's, with it's refreshing taste and nationally adored Miss Rheingold.

As the New York Times reported in 2003, "Rheingold is still paying homage to its heritage, but the focus is on its hometown." Rheingold is still headquartered in New York City and brewed Upstate.



Rheingold Beer consists of a flavorful mix of the beer's storied past and a new vision for the future.

Rheingold is currently available in thousands of locations in the New York metro area, and is coming soon to markets across the country and around the world.

**THE BEER OF NYC.**



**Home** | **About** | **Brands** | **News** | **Merchandise** | **Investor** | **Contact** | **Sitemap**

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
RBCI HOLDINGS, INC. f/k/a　　　　　　:
RHEINGOLD BREWING COMPANY,　　:
INC.,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　 :
　　　　Plaintiff,　　　　　　　　　 :
　　　　　　　　　　　　　　　　　 :
　　　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　 :
DRINKS AMERICAS HOLDINGS, LTD., :
　　　　　　　　　　　　　　　　　 :
　　　　Defendant.　　　　　　　　　:
-----------------------------------------------------X

Civil Action No. 07-cv-02877

**FIRST AMENDED COMPLAINT AND
JURY DEMAND**

RBCI Holdings, Inc., formerly known as Rheingold Brewing Company, Inc., through its

undersigned counsel, Troutman Sanders LLP, hereby complains of Drinks Americas Holdings,

Ltd. as follows:

## PRELIMINARY STATEMENT

Plaintiff Rheingold Brewing Company, Inc. ("RBCI") brings this action against

defendant Drinks Americas Holdings, Ltd. ("Drinks") to ensure that Drinks does not engage in

its stated plan of action and infringe RBCI's trademark rights. Drinks continues to be engaged in

the business of producing, marketing, advertising and selling alcoholic beverages in connection

with the trademark "Rheingold". Pursuant to Drinks' default to and material breach of a contract

between the parties, Drinks is required to reassign to RBCI various intellectual property,

including the Rheingold trademark. Drinks refuses to abide by this agreement, and has publicly

stated its intention to continue using various intellectual property, including the Rheingold

trademark. After months of being unable to secure Drinks' agreement to behave lawfully, RBCI

comes to this Court seeking to force Drinks to comply with the requirements between the parties,

the requirements of the Lanham Act, and have this Court declare that Drinks' threatened action, will constitute trademark infringement in violation of the Lanham Act.

## JURISDICTIONAL STATEMENT

1.      Jurisdiction.  This action arises under the Lanham Act 15 U.S.C. § 1051 *et. seq.*, the Federal Declaratory Judgment Act §§ 2201 and 2202 and the laws of the state of New York. Jurisdiction of the federal claim is conferred upon this court by 28 U.S.C. §§ 1331 and 1338. Jurisdiction of the state claims is conferred upon this court by 28 U.S.C. § 1367.

2.      Plaintiff RBCI is a corporation organized under the laws of the State of Delaware and maintains a principal place of business at 130 West 42nd Street, New York, New York 10036.

3.      Upon information and belief, defendant Drinks Americas Holdings, Ltd. is a corporation incorporated under the laws of the State of Delaware and having its principal place of business at 372 Danbury Road, Wilton, Connecticut 06897.

4.      Upon information and belief, Drinks transacts substantial business in this judicial district and derives substantial revenues from this judicial district.  Upon information and belief, the conduct of Drinks complained of herein has occurred in various locales, including in this judicial district.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as it is the location of a substantial part of the events or omissions giving rise to the asserted claims.

## FACTS COMMON TO ALL CAUSES OF ACTION
### (RBCI's Exclusive License To Use The Rheingold Trademark)

6.      On August 22, 1997, RBCI acquired a ninety-nine year exclusive, worldwide license to use a portfolio of intellectual property, including the trademark "Rheingold" (the "Rheingold Trademark") in connection with its marketing, distributing, sale and advertising of

beer products pursuant to a license agreement with the Stroh Brewery Company (the "Rheingold License").

7.     In or about August, 1997, RBCI adopted and commenced use of the Rheingold Trademark.

8.     Over the years, the Rheingold Trademark became widely known through extensive advertising, promotional activities, marketing and sales of RBCI's various beer products. The Rheingold Trademark and the goodwill embodied therein became of great value to RBCI.

9.     At all relevant times prior to October 27, 2005, RBCI was engaged in the business of manufacturing, marketing and distributing beer products bearing the Rheingold Trademark as well as undertaking promotion in connection therewith.

10.     On or about October 27, 2005 (the "Closing Date"), RBCI and Drinks entered into an Asset Purchase Agreement (the "APA").

### FACTS COMMON TO ALL CAUSES OF ACTION
### (Salient Provisions of the APA)

11.     The APA is the product of comprehensive, arms-length negotiations between RBCI and Drinks, whereby RBCI transferred to Drinks business assets in exchange for Drinks paying money to RBCI (the "Purchase Price") and assuming certain of RBCI's obligations (the "Assumed Obligations"). A copy of the APA is annexed hereto and is made a part of this Amended Complaint as Exhibit "A".

12.     Upon the Closing Date of the APA, the exclusive license to the Rheingold Trademark was transferred from RBCI to Drinks in connection with the APA.

13.     Pursuant to Section 3.1 of the APA, "[t]he Purchase Price [was the] sum of (i) $1,000,000, payable in shares of Common Stock, (ii) $150,000 payable in cash, and (iii) the assumption by Buyer of the Assumed Obligations" totaling $170,446.04.

14.     Pursuant to the APA, Drinks was required to make a first installment payment (the "First Installment") towards the Purchase Price at the time of the Closing.  The APA required that the First Installment consist of an indeterminate number of shares of Drinks' Common Stock with a fair market value ("FMV") of $650,000 along with the immediate assumption of the Assumed Obligations.

15.     The APA required that on the one year anniversary of the closing date, Drinks was to provide to RBCI $150,000.00 in cash in addition to the remainder of the Drinks shares due RBCI (the "Second Installment"), which consisted of an indeterminate number of shares of Drinks Common Stock with a fair market value ("FMV") of $350,000.

16.     Pursuant to Section 3.2(a) of the APA, the FMV for the shares included in the First Installment was to be determined by averaging the daily closing prices of the shares for each of the trading days during the period beginning on the day sixty (60) calendar days prior to the Closing and ending on the trading day preceding the Closing.

17.     On the Closing Date, the FMV of the Common Stock shares calculated in the manner prescribed by Section 3.2(a) of the APA was approximately $0.897/share.  As such, Drinks was obligated to convey to RBCI 724,638 shares of its Common Stock.

18.     Pursuant to Section 3.2(b) of the APA, the FMV of the Second Installment was to be determined by averaging the daily closing prices of the shares for each of the trading days during the period beginning on the day which is sixty (60) calendar days prior to the one-year

anniversary of the Closing (i.e. October 27, 2006), and ending on the trading day preceding such one-year anniversary.

19.    Because of the significant value of the Rheingold Trademark and the very substantial goodwill therein, Section 3.3 of the APA provided that in the event of Drinks' failure to tender the Second Installment, all rights under the Rheingold License would revert to RBCI.

### FACTS COMMON TO ALL CAUSES OF ACTION
### (Drinks' Wholesale Breach of The APA and Continued Use of the Rheingold Trademark)

20.    On the Anniversary Date, that is the date that the Second Installment was due, the FMV of the Common Stock shares was approximately $0.668 cents per share.  As such, Drinks was required to convey to RBCI 525,738 shares of its Common Stock and $150,000 as the Second Installment.

21.    Drinks unreasonably and willfully failed to make any portion of this Second Installment in direct contravention of the APA.

22.    For several months RBCI attempted to negotiate a mutually beneficial resolution with Drinks in order to salvage the asset sale.  These negotiations proved fruitless.

23.    On or about March 21, 2007, RBCI, through its counsel, delivered a letter to Drinks' Chief Executive Officer, Patrick Kenny, advising him that Drinks had defaulted on its obligations under the APA.

24.    Despite the aforementioned breaches of the APA, Drinks continues to be engaged in the business of producing, marketing, advertising and selling alcoholic and non-alcoholic beverages, including those marketed and distributed in connection with the Rheingold Trademark.

25. Drinks' ongoing marketing activities include the prominent display of the Rheingold Trademark on its Internet web-site maintained at the domain with the uniform resource locator http://www.rheingoldbeer.com. A true copy of the home page from Drinks' Internet web-site is annexed hereto and is made part of this Amended Complaint as Exhibit B.

26. Drinks' Internet web-site provides information as to where the purchasing public can obtain products bearing the Rheingold Trademark, including within this judicial district.

27. Drinks has failed to reassign the Rheingold License to RBCI, and it continues to use the Rheingold Trademark.

## FIRST COUNT
### (Specific Performance of Reassignment of the Rheingold License by Plaintiff RBCI)

28. Plaintiff repeats and realleges the foregoing paragraphs hereof, to the extent applicable, as though fully set forth herein.

29. The reassignment of the Rheingold License from Drinks to RBCI is contemplated in Article III of the APA. Specifically, Section 3.3 states that if Drinks "defaults in its obligation hereunder to make the second installment of the Purchase Price … then, subject to the provisions of the Rheingold License and any applicable laws and regulations, the Rheingold License shall be deemed reassigned from Buyer to Seller.

30. Drinks failed to deliver the second installment payment of Drinks Common Stock shares and $150,000 to RBCI pursuant to Section 3.2(b) of the APA. Therefore, Drinks has failed to tender the Second Installment under the APA.

31. RBCI has repeatedly informed Drinks of its position that the defendant has defaulted under the APA and consequently, the Rheingold License must be reassigned to RBCI.

32. Drinks refuses to reassign the Rheingold License to RBCI.

33.    Section 10 of the Lanham Act (15 U.S.C. § 1060) lists certain requirements for a trademark, including without limitation, that the assignment include any goodwill in the associated business as well as the assignment be in writing.

34.    Section 10 of the Lanham Act (15 U.S.C. § 1060) also provides that an assignment, in proper form, must be recorded with the United States Patent and Trademark Office, in order to be valid notice to third parties.

35.    RBCI has performed all conditions, covenants and promises to be performed on its part in accordance with the terms and conditions of the APA, except to the extent said performance has been excused or rendered impossible by Defendant.

36.    Drinks' actions have prevented RBCI with properly recording the re-assignment in compliance with the Lanham Act, 15 U.S.C. § 1060.

37.    As a proximate result of Drinks' breaches, RBCI has suffered damages in an amount according to proof at time of trial.  However, RBCI has no adequate legal remedy in that their damages cannot be properly ascertained such that any damage award will be inadequate to compensate RBCI for the harm it has suffered.  Accordingly, RBCI requests that Drinks be ordered to, *inter alia*, specifically perform its duties and obligations under the contract and reassign the Reingold Trademark to RBCI.

## SECOND COUNT
### (Declaratory Judgment of Trademark Infringement by Plaintiff RBCI)

38.    Plaintiff repeats and realleges the foregoing paragraphs hereof, to the extent applicable, as though fully set forth herein.

39.    This cause of action arises under 28 U.S.C. § 2201 and 15 U.S.C. § 1051, *et. seq.*

40.    Subject matter jurisdiction for this claim is based on 28 U.S.C. §§ 1331, 1338, 2201 and 2202.

41.    In light of Drinks' default of its obligations under Section 3.2(b) of the APA by failing to tender the Second Installment, the Rheingold License including the rights to the Rheingold Trademark must be reassigned to RBCI, extinguishing Drinks' right to exploit the Rheingold Trademark.

42.    Drinks has publicly stated that its projection for growth is tied to its continued use of the Rheingold Trademark.

43.    Drinks has publicly stated that it intends to continue to exploit the Rheingold Trademark for the foreseeable future.

44.    Upon information and belief, Drinks has indicated its intent to continue producing, marketing, advertising and selling products in connection with the Rheingold Trademark.

45.    Drinks' continued use of the Rheingold Trademark is likely to cause confusion, mistake and deception among the general purchasing public as to the origin of Drinks' products and is likely to deceive the public into believing Drinks' products originate from RBCI or otherwise are authorized by RBCI.

46.    The threatened actions and conduct of Drinks is likely to cause consumer confusion, and result in future sales being unfairly lost and/or diverted.

47.    Likewise, Drinks' action and conduct is likely to cause damage and harm to plaintiff's reputation, all to the detriment of RBCI.

48.    Without a judicial declaration that its conduct is improper, Drinks will infringe upon the Rheingold Trademark notwithstanding that it must reassign the Rheingold License to

RBCI, thereby deceiving and misleading the public and causing immediate and irreparable injury to RBCI's reputation and goodwill.

49.     By reason of Drinks' continued use of the Rheingold Trademark and its resulting constructive claims of respective trademark rights, a controversy that is justiciable in nature exists between Drinks and RBCI with respect to the right to utilize the Rheingold Trademark.

## THIRD COUNT
### (Breach of Contract)

50.     Plaintiff repeats and realleges the foregoing paragraphs hereof, to the extent applicable, as though fully set forth herein.

51.     This cause of action arises under the laws of the state of New York.

52.     Subject matter jurisdiction for this cause of action exists pursuant to 28 U.S.C. § 1367.

53.     As set forth above, Drinks has materially breached the APA by, among other things, (a) failing to deliver the second installment payment of Drinks Common Stock shares to RBCI pursuant Section 3.2(b) of the APA; (b) failing to deliver $150,000 to RBCI pursuant to Section 3.2(b) of the APA; and failing to perform its obligations regarding the Assumed Obligations.

54.     At no point did RBCI materially breach any provision of the APA, nor is RBCI currently in breach of any material provision thereof.

55.     RBCI has performed all conditions required of it under the APA.

56.     As a direct and proximate result of Drinks' breaches, RBCI has been damaged in an amount to be determined at trial.

WHEREFORE Plaintiff RBCI demands judgment and relief against Drinks as follows:

      A.    An Order that Drinks specifically perform under the Asset Purchase Agreement and reassign the Rheingold License to RBCI;

      B.    A Declaration that Drinks has infringed the Rheingold Trademark;

      C.    That RBCI be awarded damages in an amount to be determined at trial based on defendant's breaches of the Asset Purchase Agreement and the infringement of the Rheingold Trademark;

      D.    Compensatory and other damages;

      E.    Pre- and post-judgment interest;

      F.    Reasonable attorney's fees and costs; and

      G.    Such other and further relief as this court deems proper.

## DEMAND FOR A JURY TRIAL

RBCI hereby demands a trial by jury on all issues so triable.

David J. Sheehan [DS-4818]
TROUTMAN SANDERS LLP
The Chrysler Building
450 Lexington Avenue
New York, New York 10174

Dated: June 11, 2007
New York, New York

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT dated as of October 27, 2005, by and between DRINKS AMERICAS HOLDINGS, LTD, a Delaware corporation ("Buyer"), and RHEINGOLD BREWING COMPANY, INC., a Delaware corporation ("Seller").

WHEREAS, Seller has been engaged in the business of manufacturing, marketing, distributing and selling beer products under the trademark "Rheingold" pursuant to the terms of the Rheingold License (as hereinafter defined); and

WHEREAS, Buyer is engaged through subsidiaries in the production, marketing, advertising, distribution and sale of spirits, wine, beer and non-alcoholic beverages, and Buyer will be engaged in the business of manufacturing, marketing, distributing and selling beer products; and

WHEREAS, Buyer desires to acquire from Seller, and Seller is willing to sell to Buyer, substantially all of Seller's assets, including, without limitation, all rights presently held by Seller to use the trademark associated with the Intellectual Property (as hereinafter defined) in the production, marketing, advertising, distribution and sale of beer products.

NOW, THEREFORE, the parties hereto, in consideration of the premises hereof and other good and valuable consideration, hereby agree as follows:

### I. DEFINITIONS

1.1. **Definitions.** The following terms used herein shall have the meanings given to such terms below.

"Acquired Assets" means all assets of Seller, real and personal, tangible and intangible, including, without limitation, goodwill and those assets listed in Section 2.1 hereof.

"Assignment" means the assignment by Seller to Buyer of the licensee's interest in the Rheingold License.

"Assumed Contracts" means all of the executory leases, contracts and licenses listed on Schedule A attached hereto.

"Assumed Obligations" means (i) the obligations of Seller under the Assumed Contracts requiring performance on or after the Closing Date; and (ii) all obligations of Seller referred to in Schedule B hereof; provided, however, that the Assumed Obligations shall not include (x) any liabilities not specifically listed in said Schedule B, (y) any obligations of Seller to any of its employees, or (z) any taxes (including sales or transfer taxes) now or hereafter owed by Seller, or any affiliate or person related to Seller, regardless whether or not attributable to the Acquired Assets or the Business.

"Assumption" means the instrument pursuant to which Buyer shall assume the Assumed Obligations.

"Bill of Sale" means the bill of sale executed by Seller, transferring title to all the Acquired Assets to Buyer.

"Business" means Seller's business of manufacturing and selling beer products.

"Buyer" means Drinks Americas Holdings, Ltd., a Delaware corporation.

"Closing" means the Closing referred to in Section 5.1 hereof.

"Closing Date" means the date and time of the Closing.

"Common Stock" means shares of the Common Stock, par value $.001 per shares, of Buyer.

"Fixed Assets" means all Seller's fixed assets used in connection with the Business, including the machinery, equipment, spare parts and accessories, tools, dies, furniture, fixtures, office furnishings and other equipment.

"FMV" means fair market value of the Common Stock, determined as provided in Section 3.2 hereof.

"Intellectual Property" means all Seller's trade names, trade name rights, trademarks, trademark rights, logos, trade dress, licenses, patents, patent applications, patent rights, inventions (whether or not patentable), trade secrets, customer lists, copyrights (including registrations and applications therefore), technology, computer software source codes, know-how, processes, specifications, data and lab test results, formulas, projects in development, service marks, computer software, computer software modifications, enhancements and computer software derivative works, other intellectual property rights and other proprietary information, including all rights to, and intellectual property regarding, the "Miss Rheingold" promotional program.

"Inventory" means all inventory of Seller held for resale in connection with, or used to operate, the Business, including finished goods, raw materials, work-in-process, packaging, supplies and personal property and any prepaid deposits relating thereto on hand on the Closing Date, wherever located.

"Lien" means a lien, encumbrance, claim, security interest, mortgage, pledge, restriction, charge, instrument, license, encroachment, option, rights of recovery, judgment, order or decree of any court or foreign or domestic governmental entity, interest, product, tax (foreign, federal, state or local), in each case of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown and including all claims based on any theory that Buyer is a successor, transferee or continuation of Seller or the Business.

"Net Working Capital" means current assets minus current liabilities of Seller, determined in accordance with generally accepted accounting principles, consistently applied.

"Pabst" means Pabst Brewing Company, successor in interest to Stroh under the Rheingold License.

"Purchase Price" means the Purchase Price referred to in Section 3.1 hereof.

"Receivables" means all accounts receivable and notes receivable relating to the Business and outstanding at the Closing Date.

"Rheingold License" means the License Agreement dated August 22, 1997, as amended, by and between Stroh, as licensor, and Seller, as licensee, including (i) "Addendum No. 1" to License Agreement," dated August 27, 1997; (ii) "Amendment No. 1" to License Agreement dated January 13, 1998, and (iii) any other addendums, amendments, supplements or other agreement modifying the terms and conditions of the Rheingold License.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" means Rheingold Brewing Company, Inc., a Delaware corporation.

"Stroh" means The Stroh Brewery Company, an Arizona corporation.

"Tax Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

## II. PURCHASE AND SALE

2.1. **Acquired Assets.** Upon the terms and subject to the conditions set forth in this Agreement, at the Closing Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens, and Buyer shall purchase, acquire and take assignment and delivery of, all right, title and interest of Seller in and to the Acquired Assets, including the following:

(a) all Fixed Assets;

(b) all Intellectual Property;

(c) subject to Section 2.2 hereof, all inventory;

(d) subject to Section 2.2 hereof, all Receivables;

(e) all of Seller's contract rights with respect to the Acquired Assets and the Assumed Obligations;

(f) all computer software documentation, computer software source codes, computer software modifications and enhancements, computer software derivative works, all books and records, correspondence, customer lists, price lists, supplier lists, sales information, computer software and programs, if any (subject to the rights of third party licensors), and all advertising, packaging and promotional materials and files relating to the Acquired Assets or the Business;

(g) all goodwill, other intangible property and causes of action relating to the Acquired Assets or the Business;

(h) all licenses, certificates, permits and telephone numbers relating to the Business, to the extent the same are transferable;

(i) the Assumed Contracts;

(j) all current assets, including deposits, prepaid expenses and accounts receivable;

(k) all books and records relating to the Business and the Acquired Assets; and

(l) the right to use the name "Rheingold Brewing Co., Inc.," as the name of Buyer (or one of its operating subsidiaries) following the Closing as contemplated in Section 7.4 hereof.

2.2. **Assumed Obligations.** At the Closing, Buyer shall enter into the Assumption, pursuant to which Buyer shall assume the Assumed Obligations.

2.3. **Condition and Quality of Tangible and Intangible Personal Property.** Buyer acknowledges that it has fully and sufficiently inspected all items of tangible and intangible personal property which are the subject of this Agreement and agrees and acknowledges that, except for representations and warranties included herein, all such property will be sold by Seller and accepted by Buyer "AS IS, WHERE IS" with no representations or warranties of any nature, express or implied, on the part of Seller regarding the condition, quality or physical characteristics of such assets, including all warranties of merchantability and of fitness for any specific purpose.

## III. PURCHASE PRICE

3.1. **Amount.** The Purchase Price shall be the sum of (i) $1,000,000, payable in shares of Common Stock, (ii) $150,000 payable in cash, and (ii) the assumption by Buyer of the Assumed Obligations.

3.2. **Payment of Purchase Price.** The Purchase Price shall be paid by Buyer to Seller in two installments: (i) the first comprising shares of Common Stock having a FMV of $650,000 and assumption of the Assumed Liabilities, and (ii) the second comprising shares of Common

Stock having a FMV of $350,000 and cash in the amount of $150,000, the first such installment to be delivered at the Closing and, subject to the provisions of Section 7.7 hereof, the second such installment to be delivered at the first anniversary thereof. (Notwithstanding the foregoing, Buyer shall have the option to pay all or any portion of such second installment at any time prior to such first anniversary.) For the purposes hereof, the FMV of the Common Stock shall be determined as follows:

> (a) The FMV of shares of Common Stock to be delivered at the Closing shall be the average of the daily closing prices of such shares for each of the trading days during the period beginning on the day which is 90 calendar days prior to the Closing and ending on the trading day preceding the Closing; and

> (b) The FMV of shares of Common Stock at the first anniversary of the Closing shall be the average of the daily closing prices of such shares for each of the trading days during the period beginning on the day which is 90 calendar days prior to such anniversary, and ending on the trading day preceding such anniversary; provided, however, that Buyer shall have the right to elect to pay such second installment of the Purchase Price entirely in cash on said anniversary.

The closing price for each day referred to in subsection (a) or (b) above shall be the reported closing price of the Common Stock as reported on the OTC Bulletin Board ("OTCBB") of the National Association of Securities Dealers, Inc. or, in case no such closing price is reported on such day, the average of the closing bid and asked prices regular way for such day reported on the OTCBB or, on such principal national securities exchange on which the shares of the Common Stock shall be listed or admitted to trading, or if they are not listed or admitted to trading on any national securities exchange, but are traded in the over-the-counter market, the closing sale price of the shares of Common Stock or, in case no sale is publicly reported, the average of the representative closing bid and asked quotations for the shares of Common Stock on the National Association of Securities Dealers Automated Quotation ("NASDAQ") system or any comparable system, of if the Common Stock is not listed on the NASDAQ system or a comparable system, the closing sale price of the shares of Common Stock or, in case no sale is publicly reported, the average of the closing bid and asked prices as furnished by the National Quotation Bureau, incorporated, or if such organization is no longer in business, by such other source or sources as the Board of Directors ("Board") of the Company may reasonably select for that purpose.

3.3. Nonpayment/Insolvency. In the event that (i) Buyer defaults in its obligation hereunder to make the second installment of the Purchase Price, or (ii) prior to the one (1) year anniversary of the Closing, Buyer shall become insolvent, exercise an assignment for the benefit of creditors, go into liquidation, or a trustee is appointed for the benefit of creditors, then, subject to the provisions of the Rheingold License and any applicable laws and regulations, the Rheingold License shall be deemed reassigned from Buyer to Seller.

## IV. ASSUMPTION OF CONTRACTS AND LIABILITIES

4.1. <u>Assumption</u>. At the Closing, Buyer shall assume and agree to pay, perform, fulfill and discharge, and shall indemnify and hold Seller harmless from and against, (i) the Assumed Obligations, and (ii) the portions of the Purchase Price described in Section 3.2 hereof

4.2. <u>No Other Liabilities</u>. It is expressly agreed and understood that, except as provided in Sections 4.1 and 4.2 hereof, Buyer is not assuming any liability or obligation of Seller of any kind or nature whatsoever, whether accrued or unaccrued, contingent or noncontingent, material or nonmaterial, or known or unknown as of the Closing Date, including, without limitation, any liability or obligation (i) for taxes (including sales or transfer taxes) now or hereafter owed by Seller, or any affiliate or person related to Seller, or attributable to the Acquired Assets or the Business, and relating to any period, or any portion of any period, ending on or prior to the Closing Date or to the sale of the Acquired Assets to Buyer; (ii) under any contract or agreement other than the Assumed Contracts; (iii) accruing under the Assumed Contracts prior to the Closing Date; (iv) relating to or arising out of any product manufactured or sold, or service rendered, by Seller prior to the Closing Date; (v) relating to or arising out of the relationship between Seller and any employee or independent contractor, including workers compensation claims; (vi) for monies due to any third party; or (vii) relating to or arising out of the conduct or operation of the Business prior to the Closing Date. The transfer of the Acquired Assets pursuant to this Agreement shall be free and clear of all Liens.

## V. CLOSING

5.1. <u>Closing</u>. The closing of the sale and purchase of the Acquired Assets (the "Closing") shall be held at the offices of Rheingold Brewing Company, 130 West 42nd Street Suite 814 New York, NY 10036, and shall occur on or before (i) November 1, 2005, or (ii) such later date on which the parties hereto may agree, provided that all of the other conditions precedent set forth in Article VIII hereof have been satisfied or waived by the applicable party, and further provided that this Agreement has not been terminated pursuant hereto.

5.2. <u>Transactions at Closing</u>. At or before the Closing, each of the following shall occur:

(a) Seller shall deliver the Assignment;

(b) Seller shall duly execute and deliver to Buyer the Bill of Sale and such other certificates of title and other instruments of assignment or transfer with respect to the Acquired Assets, all in such form as is reasonably acceptable to Buyer's counsel, as Buyer may reasonably request and as may be necessary to vest in Buyer all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens;

(c) Buyer shall deliver to Seller the shares of Common Stock representing the first installment of the Purchase Price as provided in Section 3.2 hereof;

(d) Seller shall assume all expenses under real estate and equipment leases, to the extent such leases constitute Assumed Contracts. Buyer shall be responsible for the real estate lease hereunder effective October 1, 2005; and

(e) Buyer and Seller shall duly execute or deliver such certificates and documents (including officer's and secretary's certificates and certificates of good standing) and third party consents as may be required to effectuate the transactions contemplated by this Agreement or as may be reasonably requested by Buyer or Seller, as the case may be.

## VI. REPRESENTATIONS AND WARRANTIES

6.1. Representations of Seller. Seller represents and warrants to Buyer as follows:

(a) Organization. Seller, as of the Closing Date, will be a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, has all requisite power and authority to own and hold the Acquired Assets owned or held by it, to conduct the Business as currently conducted by Seller, and is duly licensed or qualified to do business in each jurisdiction in which the operation of the Business makes such licensing or qualification necessary;

(b) Authority. (i) Subject to obtaining the approval of stockholders, as required by Section 7.1 hereof, Seller shall have all requisite corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; (ii) Seller shall have obtained any necessary approvals for the execution and delivery of this Agreement and the consummation of the transaction contemplated hereby; and (iii) this Agreement shall have been duly executed and delivered by Seller and (assuming due authorization, execution and delivery by Buyer) shall constitute Seller's legal, valid and binding obligation, enforceable against it in accordance with its terms;

(c) Non-Contravention. Neither the execution and delivery of this Agreement by Seller nor the consummation by Seller of the transactions contemplated hereby shall constitute a violation of or be in conflict with, constitute or create a default under, or result in the creation or imposition of any Liens upon any property of Seller pursuant to (i) its certificate of incorporation or By-laws; (ii) any agreement or commitment to which Seller is a party or by which Seller or any of its properties are bound, or to which Seller is subject; or (iii) any law or statute or any judgment, decree, order, regulation or rule of any court or governmental or regulatory authority relating to Seller;

(d) Compliance with Laws. Seller has conducted and continues to conduct the Business so as to comply in all material respects with all laws and statutes and rules, regulations, judgments, orders or decrees of any court or governmental or regulatory authority applicable to Seller or any of its properties or assets, including the Acquired Assets and the Business, and Seller is not in violation of any such laws, statutes, rules, regulations, judgments, orders or decrees;

(e) Litigation. Except as set forth on Schedule 6.1(e) hereto, there are no actions, suits, proceedings or investigations pending or threatened, relating to or affecting the Business or the Acquired Assets, or which question the validity of this Agreement or challenge any of the transactions contemplated hereby or the use of the Acquired Assets or the conduct of the Business after the Closing by Buyer;

(f) Acquired Assets. Seller owns, and has the unrestricted right to transfer and assign to Buyer at the Closing, all right, title and interest in and to the Acquired Assets free and clear of all Liens;

(g) Assumed Contracts. Each of the Assumed Contracts is in full force and effect as of the date hereof. Seller has performed all obligations required to be performed by it and is not in default thereunder, and no event has occurred which, with the lapse of time and/or giving of notice, would constitute a default by Seller thereunder;

(h) Confidentiality. Seller has taken all commercially reasonable steps necessary to preserve the confidential nature of all material confidential information (including any proprietary information) with respect to the Business, Acquired Assets and Assumed Contracts;

(i) Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller;

(j) Fixed Assets. Schedule 6.1(j) hereto sets forth a true and complete list and description of the Fixed Assets, which include all of the manufacturing assets used in the operation of the Business;

(k) Intellectual Property. The Acquired Assets include, and Schedule 6.1 (k) hereto sets forth a true and complete list of, all Intellectual Property heretofore or currently used or required to be used in connection with the Business, including, without limitation, all rights to, and intellectual property regarding, the "Miss Rheingold" promotional program, To the best of Seller's knowledge, except as otherwise indicated on said Schedule, (i) all such Intellectual Property is owned by Seller and is not subject to any Lien, (ii) no product manufactured or sold, and no manufacturing process or Intellectual Property used by Seller in connection with the Business infringes or has infringed upon any intellectual property of others, and (iii) Seller has not received any notification or claim of infringement by Seller of any intellectual property from any person and is not aware of a basis for any such claim;

(l) Pabst Notice. Pabst has, pursuant to its contract rights to negotiate for and consummate the purchase of Seller or an interest therein as provided in Section 11 of the Rheingold License (the "Pabst Rights"), been given adequate, timely, and proper notice of the instant transaction, and has allowed the time frame within which to exercise its Pabst Rights to lapse, therefore permitting the instant transaction to proceed; and

(m) Securities Law Matters. Seller has determined that, except as shown on schedule 6.1(m) hereto, (i) each of its stockholders (the "Stockholders") meets the definition of an "accredited investor" contained in Section 5.03 of Regulation D promulgated by the SEC under the Securities Act, (ii) each of such Stockholders has acknowledged that the shares of Common Stock to be received upon. the dissolution of Seller will be "restricted securities" as defined in Rule 144 as promulgated by the SEC which may be sold only as provided in said Rule unless Buyer is satisfied that another exemption from the Securities Act is available, and (iii) Seller has provided its Stockholders with materials and information concerning Buyer and the transactions proposed to be carried out pursuant hereto, copies of which have been provided to Buyer, which materials and information do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were mad, not misleading.

**6.2. Representations of Buyer.** Buyer represents and warrants to Seller as follows:

(a) Binding Effect. This Agreement has been duly executed and delivered by Buyer and (assuming due execution and delivery by Seller) constitutes the legal, valid and binding obligation of Buyer and, enforceable against Buyer in accordance with its terms;

(b) Authorized Shares. Buyer has sufficient authorized but unissued shares of Common Stock available to deliver to Seller and to enable Seller to pay the Purchase Price for the Acquired Assets in accordance with the terms of this Agreement;

(c) Non-Contravention. Neither the execution and delivery of this Agreement by Buyer nor the consummation by Buyer of the transactions contemplated hereby shall constitute a violation of, or be in conflict with, constitute or create a default under, or result in the creation or imposition of any Liens upon any property of Buyer pursuant to (i) any agreement or commitment to which Buyer is a party or by which Buyer or any of its properties are bound, or to which Buyer is subject; or (ii) any law or statute or any judgment, decree, order, regulation or rule of any court or governmental or regulatory authority relating to Buyer;

(d) Governmental Consents. There are no consents, approvals or authorizations of, or registrations, qualifications or filings with, governmental or regulatory agencies or authorities necessary in connection with the execution and delivery of this Agreement by Buyer or for the consummation by Buyer of the transactions contemplated hereby;

(e) Litigation. There are no actions, suits, proceedings or investigations pending or threatened against either Buyer which question the validity of this Agreement or challenge any of the transactions contemplated hereby; and

(f) Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

(g) Compliance with Laws. Buyer has conducted and continues to conduct its business so as to comply in all material respects with all laws and statutes and rules, regulations, judgments, orders or decrees of any court or governmental or regulatory authority applicable to Buyer or any of its properties or assets, and Buyer is not in violation of any such laws, statutes, rules, regulations, judgments, orders or decrees.

## VII. COVENANTS

7.1. Stockholder Approval. Seller shall obtain the approval of its Stockholders to the entering into of this Agreement and performance of all the obligations of Seller contemplated hereby, and shall present to Buyer evidence thereof, not later than five business days following the execution hereof.

7.2. Conduct of Business Prior to Closing. Prior to the Closing, Seller shall continue to operate the Business only in the ordinary and usual course and consistent with Seller's past practices. Without limiting the generality of the foregoing, Seller shall use all commercially reasonable efforts and diligence (i) to preserve the business operations of Seller and the Business intact, (ii) to keep available the services of its current personnel, (iii) to preserve in full force and effect and to perform the contracts, agreements, instruments, leases, and licenses of Seller, and the arrangements and understandings of Seller, (iv) to preserve the goodwill of Seller's suppliers, customers, community and others having relations with Seller, (v) to continue in full force and effect all binders and policies of insurance of Seller and (vi) to continue its advertising and promotional activities, if any, and pricing and purchasing policies, in accordance with past practices.

7.3. Liability Concerning Unassumed Obligations. Following the Closing, Seller shall be solely responsible for the payment, settlement, or other disposition of all obligations of Seller not specifically being assumed by Buyer pursuant to this Agreement. Pursuant to such obligation, Seller shall indemnify and save harmless Buyer (and any of its officers, directors, or affiliates) from and against all liabilities, costs, damages, suits, or claims arising out of any matter arising out of any such unassumed obligation. The foregoing indemnification shall include, without limitation, the obligation to defend Buyer (or any of its officers, directors, or affiliates) in the event of any claim or suit arising out of any such unassumed obligation, and the prompt reimbursement or direct payment of any legal fees and disbursements incurred by Buyer (or any of its officers, directors, or affiliates) with its own counsel in dealing with or defending any claim by any holder of any such unassumed obligation.

7.4 Liability Concerning Assumed Obligations. Following the Closing, Buyer shall be solely responsible for the payment, settlement, or other disposition of all of the Assumed Obligations. Pursuant to such obligation, Buyer shall indemnify and hold harmless Seller (and any of its officers, directors, or affiliates) from and against all liabilities, costs, damages, suits, or claims arising out of any of the Assumed Obligations. The foregoing indemnification shall

include, without limitation, the obligation to defend Seller (or any of its officers, directors, or affiliates) in the event of any claim or suit arising out of an Assumed Obligation, and the prompt reimbursement or direct payment of any legal fees or disbursements incurred by Seller (or any of its officers, directors, or affiliates) with its own counsel in dealing with or defending any matter arising out of an Assumed Obligation.

7.5. **Access.** From the date hereof until the Closing, upon reasonable notice, Seller shall, and shall cause its officers, directors, employees, agents and counsel to (i) afford the officers, employees, and authorized agents, accountants, counsel and financing sources and representatives of Buyer reasonable access, during normal business hours, to the offices, properties, other facilities, books and records of Seller and to those officers, directors, employees, agents, accountants and counsel of Seller who have knowledge relating to the Business, and (ii) furnish to the officers, employees and authorized agents, accountants, counsel, financing sources and representatives of Buyer such additional financial and operating data and other information regarding the Business and the Acquired Assets as Buyer from time to time may reasonably request.

7.6. **Use of Corporate Name.** Seller agrees that, promptly following the Closing, it shall file a change of name certificate with the Secretary of State of Delaware, changing the corporate name of Seller to one not containing the word "Rheingold," and consents to Buyer, should Buyer so elect in its sole discretion, to establish a subsidiary to be called "Rheingold Brewing Company, Inc." or a variation thereof.

7.7. **Retention of Records.** In order to facilitate the resolution of any claims made by or against or incurred by Buyer, for a period of three years after Closing, Seller shall (i) retain the books and records of Seller which are not transferred to Buyer pursuant to this Agreement relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller, and (ii) upon reasonable notice, afford the officers, employees and authorized agents and representatives of Buyer reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records.

7.8. **Collection of Receivables.** In the event any payment for an account receivable is delivered to Seller or any affiliate of Seller after Closing, Seller shall, or shall cause its affiliate to, deliver such payment to Buyer promptly and in any event within ten days of receipt thereof.

7.9. **Post-Closing Audit.** In the event that, within six months of the Closing, Buyer conducts a post-Closing accounting review and, as a result thereof, determines that the Company's Net Working Capital was less than the amount thereof required by Section 8.1(d) hereof, Buyer shall be entitled to deduct the aggregate of (i) any shortfall in Net Working Capital between the actual (as determined by such accounting review) and required amount thereof, from required FMV of the second installment of the Purchase Price; provided, however, that in the event that a dispute arises between Buyer and Seller as to any amount or amounts determined in such accounting review, Buyer and Seller shall each designate an accountant to resolve such dispute and such accountants shall endeavor to agree on the amounts in question, failing which such accountants shall agree on a third accountant, which is unaffiliated with either Buyer or any of Seller, who shall determine the amount or amounts in question.

**7.10. Covenants regarding Allocation of Purchase Price.** Prior to the Closing, the parties shall agree on an allocation of the Purchase Price among the acquired assets in a manner which complies with the requirements of the Tax Code. The parties agree that (i) the respective federal, state, local and foreign tax returns to be filed by each of them shall reflect such allocation, (ii) they shall cooperate in the preparation of such forms, and (iii) neither of them shall take any position contrary to such allocation in any tax return, in any refund claim, in any litigation, or otherwise, unless otherwise required to do so under applicable law.

## VIII. CONDITIONS OF CLOSING

**8.1. Conditions to Buyer's Obligations.** The obligation of Buyer to consummate the Closing shall be subject to the satisfaction at or prior to the Closing of each of the following conditions (to the extent noncompliance is not waived in writing by Buyer in Buyer's sole and absolute discretion), unless the failure of any such condition to be satisfied shall be the fault of Buyer:

(a) Representations. The representations and warranties made by Seller in or pursuant to this Agreement shall be true and correct in all material respects at and as of the Closing Date with the same effect as though such representations and warranties had been made or given at and as of the Closing Date;

(b) Compliance with Agreement. Seller shall have performed and complied in all material respects with all of its covenants and other obligations under this Agreement to be performed or complied with on or prior to the Closing Date;

(c) Compliance with the Law. No litigation shall be pending which purports to restrain or prevent the transactions contemplated by this Agreement, and Seller and Buyer shall have complied with all applicable requirements of statutes and governmental orders, regulations and rules relating to the transactions contemplated by this Agreement and the Closing hereunder;

(d) Net Working Capital. The Net Working Capital of Seller at the Closing Date shall not be less than ($9,000) ; and

(e) Stockholder Information. Seller shall have advised Buyer of the residences and numbers of shares of capital stock of Seller owned by each Stockholder to enable Buyer to prepare and file a Form D relating to the issuance of Common Stock contemplated hereby and to make such filings as may he required pursuant to the blue sky laws of the jurisdictions in which such Stockholders reside.

**8.2. Conditions to Seller's Obligations.** The obligation of Seller to consummate the Closing shall be subject to the satisfaction at or prior to the Closing of each of the following conditions (to the extent noncompliance is not waived in writing by Seller in Seller's sole and absolute discretion), unless the failure of any such condition to be satisfied shall be the fault of Seller:

(a) Representations. The representations and warranties made by Buyer in or pursuant to this Agreement shall be true in all material respects at and as of the Closing Date with the same effect as though made or given at and as of the Closing Date;

(b) Compliance with Agreement. Buyer shall have performed and complied in all material respects with all of its covenants and other obligations under this Agreement to be performed or complied with at or prior to the Closing Date; and

(c) Compliance with the Law. No litigation shall be pending which purports to restrain or prevent the transactions contemplated by this Agreement, and Seller and Buyer shall have complied with all applicable requirements of statutes and governmental orders, regulations and rules relating to the transactions contemplated by this Agreement and the Closing hereunder.

## IX. TERMINATION

9.1. Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a) by mutual written consent of Buyer and Seller;

(b) by either Buyer or Seller if, without fault of the party seeking termination, the Closing shall not have occurred on or before December 31, 2005;

(c) by either Buyer or Seller if, without fault of the party seeking termination, any court of competent jurisdiction in the United States or any other United States governmental authority shall have issued an order, decree or ruling, or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby, and such order, decree, ruling or other action shall not have been reversed by a final and nonappealable order; or

(d) by either Buyer or Seller, if the other party hereto shall have materially breached the representations and warranties set forth in Article VI hereof or otherwise failed to perform any of its material covenants and agreements in this Agreement.

9.2. Effect of Termination. In the event of the termination of this Agreement pursuant to Section 8.1 hereof, (i) this Agreement shall forthwith become null and void and have no further force and effect, and (ii) neither of the parties hereto nor any of their respective directors, officers, stockholders, members, affiliates, representatives or advisors shall have any further obligation or liability under the provisions hereof.

## X. MISCELLANEOUS

10.1. **Risk of Loss.** Seller shall be responsible for any casualty loss to the Acquired Assets prior to the Closing. In the event of any such loss, Seller shall give written notice thereof to Buyer within one business day and, to the extent insurance proceeds are available to remedy such loss, Seller shall proceed to remedy such loss. If the loss is not remedied within 60 days after the occurrence thereof, regardless of the reason therefore, Buyer shall have the right to terminate this Agreement by giving written notice to Seller within five business days after the expiration of such 60-day period. If such notice is not given by Buyer within such five business day period, the Closing shall take place as provided herein, and the Purchase Price shall be appropriately adjusted to reflect such loss.

10.2. **Expenses.** All expenses of the preparation, execution and consummation of this Agreement and of the transactions contemplated hereby including the fees and disbursements of attorneys, accountants, and outside advisors, shall be borne by the party incurring such expenses. Any taxes in the nature of a sales, use and/or transfer tax imposed or payable in connection with the sale or transfer of the Acquired Assets shall be paid by Seller.

10.3. **Non-Agency.** Nothing in this Agreement shall be construed to constitute either party the agent of the other or to constitute the parties as members of a joint venture of partners, nor shall any similar relationship be deemed to exist between them.

10.4. **Severability.** If any provision of this Agreement shall be determined to be invalid or unenforceable by any arbitrators, any court of law or any government agencies, the remaining provisions shall be severable and enforceable in accordance with their terms so long as this Agreement without such invalid or unenforceable provision does not fail of its essential purpose or purposes. The parties shall negotiate in good faith to replace any such invalid or unenforceable provision or provisions with suitable provisions which shall maintain the economic purposes and intentions of this Agreement.

10.5. **Notices.** Any notice to be given hereunder shall be in writing and shall be deemed duly given (i) upon mailing a confirmation by first class mail, postage prepaid, of a facsimile or e-mail transmission, (ii) when sent by overnight delivery by courier, or (iii) when mailed by registered or certified mail return receipt requested and postage prepaid:

(a) if to Seller, addressed to:
   Rheingold Brewing Company, Inc.
   130 West 42nd Street
   New York, NY 10036
   Attention: Mr. Norman E. Snyder

With a copy to:

   Sanford G. Hausner, Esq.
   Buchanan Ingersoll PC
   1 Chase Manhattan Plaza
   New York, NY 10005

(b) if to Buyer, addressed to:

      Drinks Americas Holdings, Ltd,
      372 Danbury Road
      Wilton, Connecticut 06897

          Attention: Mr. Patrick Kenny

with a copy to:

      Fredrick Schulman, Esq.
      241 Fifth Avenue, Suite 302
      New York, New York 10016

or to such other address as either party hereto shall designate in writing to the other party.

10.6. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the parties hereto, whether written or oral, in connection therewith. No modification of any of the terms and conditions of this Agreement shall be valid unless contained in a written instrument signed by both parties hereto.

10.7. **Waiver.** A waiver by either party hereto of any particular default or breach by the other party shall not affect or prejudice the rights of the aggrieved party with respect to any other default or breach whether of the same or different nature.

10.8. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed wholly within such State.

10.9. **Jurisdiction and Venue.** Each of the parties hereto hereby consents to the exclusive jurisdiction of the state or federal courts located in the Borough of Manhattan, New York, and agrees that any action concerning a dispute arising out of or relating to this Agreement shall be brought in any such court and that process, notice of motion, or other application of the court, or a judge thereof, or any notice in connection with the proceedings provided for herein may be served within or without the State of New York as provided herein for the serving of notices hereunder.

10.10. **Captions.** The captions heading each Article of this Agreement are for convenience only and shall have no effect on the interpretation on meaning of this Agreement.

10.11. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

10.12. **Assigns.** This Agreement shall be binding upon and shall inure to the benefit of each of parties hereto and their respective successors and permitted assigns. Neither this Agreement, nor the obligations of any party hereunder, shall be assignable or transferable by any such party without the prior written consent of the other party hereto; provided., however, Buyer shall have the right to assign its rights and obligations hereunder to an affiliate of Buyer without the prior written consent of Seller so long as Buyer remains liable hereunder as if no assignment had occurred.

10.13. **Surviving Provisions.** Upon the expiration or termination of this Agreement, each of Buyer's and Seller's obligations under Section 8 hereof and such other provisions hereof which by their terms are not clearly intended to expire upon such expiration or termination or at a specified time thereafter, shall survive such expiration or termination or lapse of such specified time.

10.14. **Specific Performance.** The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity without the necessity of demonstration of inadequacy of monetary damages

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be duly executed and delivered by its respective duly authorized representative as of the date and year set forth above.

Buyer:
DRINKS AMERICAS HOLDINGS, LTD.

By: _____

Seller:
RHEINGOLD BREWING COMPANY, INC,

By: _____
NORMAN E. SNYDER
CFO

# ASSET PURCHASE AGREEMENT

### Schedule B
### Assumed Obligations

| Vendor | Amount |
|---|---|
| FX Matt | $30,389.82 |
| Manhattan Beer Distributors | $23,102.22 |
| Pabst Brewing Company | $6,613.25 |
| Micro Star | $3,192.75 |
| Ryan LLC | $7,648.33 |
| Giant Step | $45,000.00 |
| Fine Products | $30,000.00 |
| Coney Island USA | $6,000.00 |
| Joseph Owades | $8,350.00 |
| Renotech | $5,586.28 |
| Commercial Distributors | $364.60 |
| Drinx Unlimited | $186.67 |
| F&F Distributors | $243.20 |
| LA Piccirillo | $1,243.00 |
| Mincolla Distributing | $66.90 |
| Premier Distributors | $1,839.15 |
| Franklin Distributors | $119.87 |
| Suffolk County Vol. FF Burn Ctr. | $500.00 |
| **Total** | **$170,446.04** |

# EXHIBIT B



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
RBCI HOLDINGS, INC. f/k/a              :
RHEINGOLD BREWING COMPANY,             :
INC.,                                  :         Civil Action No. 07-cv-02877
                                       :
        Plaintiff,                     :
                                       :         **CERTIFICATE OF SERVICE**
        v.                             :
DRINKS AMERICAS HOLDINGS, LTD.,        :
                                       :
        Defendant.                     :
-----------------------------------------------------X


        I hereby certify that on this the 11th day of June, 2007, a true and accurate copy of the

foregoing Plaintiff's First Amended Complaint and Jury Demand was transmitted via federal

express upon:

        Sheldon H. Gopstein, Esq.
        Law Offices of Sheldon H. Gopstein, Esq.
        130 West 42nd Street, Suite 410
        New York, NY 10036


                            by:    _____
                                   Jason S. Oliver
                                   Troutman Sanders LLP
                                   The Chrysler Building
                                   405 Lexington Avenue
                                   New York, New York 10174


Dated: June 11, 2007
       New York, New York

**EXHIBIT C**

# LICENSE AGREEMENT

THIS AGREEMENT is made and entered into this _22_ day of _August_, 1997, by and between The Stroh Brewery Company, an Arizona corporation located and having a place of business at 100 River Place, Detroit, MI 48207(hereinafter called "Licensor") and Rheingold Brewing Company LLC, a Connecticut limited liability company located at 1771 Post Road East, Suite 236, Westport, CT 06880 (hereinafter called "Licensee").

## WITNESSETH:

WHEREAS, Licensor is the owner of exclusive rights in the marks listed in Exhibit A attached hereto and incorporated herein (hereinafter collectively, the "Mark") for beer; and

WHEREAS, Licensee is in the business of marketing, distributing and selling beer products, and desires to obtain a license from Licensor to use the Mark upon, and in connection with the manufacture, distribution, sale, and advertising of said products (hereinafter called "Licensed Product").

NOW, THEREFORE, for and in consideration of the mutual covenants and undertakings of the parties hereinafter set forth, the parties hereto agree as follows:

## GRANT

1.      (a)      Licensor hereby grants to Licensee an exclusive license and right to use the Mark to identify only the Licensed Product and in connection with the manufacture, distribution, sale, advertising, and promotion of the Licensed Product, including ancillary products used in marketing and merchandising the Licensed Product, subject to the provisions, conditions, and limitations set forth in this Agreement.  Licensee shall also have the right under this Agreement to use the Mark as part of its assumed business name, e.g., Rheingold Brewing Company, for so long as this agreement remains in effect.

(b)      The Territory covered by this grant is worldwide.

(c)      Licensee acknowledges that its violation of any of the covenants of this Agreement relating to the use of the Mark, or its failure to observe any of the limitations upon the license herein granted, will result in immediate and irreparable damage to Licensor.  Licensee admits that there is no adequate remedy at law for such violation or failure, and agrees that in the event of such violation or failure Licensor shall be entitled to equitable relief by way of temporary and permanent injunctions and to such other relief as any court with jurisdiction may deem just and proper.

## TERM

2.    (a)    The period during which this Agreement shall be in effect is the term starting on the date this Agreement is executed by both parties, and ending 99 years from said date, unless terminated earlier as provided for herein.  At the expiration of such term, Licensee shall have an option, exercisable in writing six months prior to the end of the term, to extend the term for an additional 99 year period.  Should Licensee fail to sell a minimum of 2,000 barrels of the Licensed Product in the third year of this Agreement, or in any subsequent year, Licensor may, at its option, terminate the term of this Agreement by written notice to Licensee within sixty (60) days following the end of the third year or in any other subsequent year.

(b)    Licensee shall not be deemed in default or otherwise liable hereunder due to its inability to perform by reason of any fire, earthquake, flood, epidemic, accident, explosion, casualty, strike, lockout, labor controversy, riot, civil disturbance, act of public enemy, embargo, war, act of God, or any municipal, county, state, national or international ordinance or law or any executive, administrative, judicial or similar order (which order is not the result of any act or omission to act which would constitute a default under this Agreement), or any failure or delay of any transportation, power or other essential thing required, or similar causes beyond Licensee's control. Immediately upon the occurrence of such an event, Licensee shall notify Licensor of its attendant inability to perform hereunder. Any delay in performance shall be no greater than the event of force majeure causing the delay. If an event of force majeure continues uninterrupted for a period exceeding twenty-four (24) consecutive months, either Party may elect immediately to terminate this Agreement upon notice to the other, but such right of termination, if not exercised, shall expire immediately upon the discontinuance of the event of force majeure.

## ROYALTY

3.    (a)    In consideration of the license granted herein, Licensee shall pay Licensor royalties in accordance with the royalty schedule set forth below:

Royalty per bbl. shipped (net of returns):

| | |
|---|---|
| 1998 | $2.00 |
| 1999 | $2.00 |
| 2000 | $2.00 |
| 2001 | $2.00 |
| 2002 | $2.00 |
| 2003 | $2.50 |
| 2004 | $2.50 |
| 2005 | $2.75 |
| 2006 | $2.75 |
| 2007 | $3.00 |
| 2008+ | $3.00 |

All royalties shall be paid within 45 days of the end of each calendar year quarter.

    (b)    The Royalty Payment for sales by Licensee to parties outside the United States, its territories and possessions, shall be $10.33 per barrel.

## TRADEMARK USE

    4.    (a)    Licensee acknowledges and confirms Licensor's ownership of the Mark as well as its validity. Licensee further acknowledges and confirms the Licensee will not at any time put in issue the validity of the Mark or challenge Licensor's ownership or rights in the Mark or Licensor's authority to enter into this Agreement with Licensee. Licensee represents and acknowledges that all use of the Mark hereunder shall inure to the benefit of Licensor.

    (b)    Copyright, trademark or other protection relating to the Mark may be obtained only by Licensor at its own expense. Licensee will fully cooperate with Licensor in any action by Licensor for protection of such rights and shall furnish Licensor with all information and specimens which it may require for use in procuring the same. Should Licensee desire to sell the Licensed Product in a particular country, it shall so notify Licensor, and Licensor shall apply to register the mark in such country if it has not already done so.

    (c)    Licensor warrants and represents that the trademark registrations set forth on Exhibit A are in full force and effect and in good standing, and further agrees to maintain such registrations in full force and effect for so long as this Agreement remains in effect. Licensor further represents that to the best of its knowledge there are no presently pending suits, claims or encumbrances that could or will jeopardize the good standing of the Mark or the Mark's registrations, or Licensee's ability to use the Mark in its exercise of its rights hereunder. Should any party assert a claim, suit or action challenging the validity of the Mark or Licensee's ability to use the Mark, Licensor will defend such claim, suit or action at its own cost, and Licensee will cooperate in the defense of same.

## PRODUCTION, PROMOTION, SALE AT LICENSEE'S INSTANCE AND EXPENSE

    5.    (a)    Except as otherwise provided in this Agreement, or as the parties may otherwise agree, the manufacture, distribution, advertising, promotional activity, and sale of the Licensed Product shall be at Licensee's sole cost and expense and at no cost and expense to Licensor. Accordingly, Licensee represents and agrees that Licensee will pay all the costs and expenses, losses, liabilities, and judgments that may be associated with or arise from Licensee's manufacture, distribution, and sale of the Licensed Product, except as otherwise provided herein.

    (b)    Licensee shall be responsible for the manufacture, distribution, advertising, promotional activity and sale of the Licensed Product. All activities relating to the advertising, promotion, sale and distribution of the Licensed Product shall be consistent with the image of the Licensed Product as a quality beer brand. Upon Licensor's reasonable request, no more than once per contract year, Licensee will review its

-3-

marketing plan for the Licensed Product with Licensor and will consult with Licensor as to the Licensee's marketing activities. Licensee shall have ultimate responsibility for implementing and executing all marketing activities. Licensee shall have the right to introduce line extensions under the Mark as part of any such marketing plan.

(c)    Licensee shall position the Licensed Product as a high quality premium brand on a long term basis. Licensee shall advertise, promote and sell the Licensed Product consistent with such positioning.

(d)    Licensee shall produce the Licensed Product through a contract brewer. Such contract brewer shall be a brewer qualified to produce the Licensed Product to the strict standards established for the Licensed Product. Following the end of the third year of this Agreement, Licensor shall have the option to become the contract brewer for the Licensed Product at a contract brewing fee net of ingredient and packaging costs at least 10% below the fee charged to the Licensee by the previous contract brewer. In the event Licensor exercises such option, it shall charge Licensee for materials related to the production of the Licensed Product at Licensor's cost, including all relevant volume discounts and chargebacks that Licensor receives from suppliers or otherwise. To the extent Licensor is required to make any changes in its production line in order to brew the Product, it shall bear the cost of any such changes. Notwithstanding the foregoing, should at any time Licensee become the owner or otherwise control a brewing facility, it shall have the right to produce the Licensed Product at such brewery, for as long as it continues to own or control the brewery, provided that should Licensee need to terminate any existing contract brewing agreement or arrangement with Licensor it shall do so in accordance with the terms and conditions of such agreement or arrangement.

(e)    To the extent available to Licensor, Licensor shall make available to Licensee any historical materials or copies of historical materials relating to the Licensed Product, including any advertising and promotional materials formerly used by Licensor or its predecessors, marketing materials, packaging materials and brewing records. To the extent Licensor owns or has the right to use any such materials, it will make available such materials to Licensee for use in manufacturing, marketing, advertising and promoting the Licensed Product. Licensee shall pay the costs of any insurance or special handling charges that may be associated with the transport and delivery of such materials to Licensee and for the return to Licensor.

(f)    Licensor has notified most of its distributors that it has discontinued the Licensed Product. Licensor has provided or will, within 30 days of its execution of this Agreement, provide Licensee with (1) a list of those former distributors of Rheingold beer products that were authorized to distribute such products as of the date Licensor discontinued production of the products, along with true copies of contracts with such distributors that can be reasonably located by Licensor, (2) a list of all former distributors of Rheingold beer products who received notice from Licensor of the discontinuation of such products, along with copies of all letters or notices to distributors informing them that such products have been discontinued, (3) a list of former distributors of Rheingold beer

-4-

products that have been sent revised contracts by Licensor removing authorization to distribute Rheingold beer products, such list to also indicate which former distributors have executed such revised contracts, and (4) other reasonable assistance to Licensee with respect to information concerning former distributors of Rheingold beer products. Licensor is, to the best of its knowledge, not aware of any claims by former distributors of Rheingold beer products with regard to their alleged right to continue to distribute such products, or otherwise contesting the discontinuance of such products. Licensee shall be exclusively responsible for selecting and appointing distributors for the Licensed Product.

## RELATIONSHIP OF THE PARTIES

6.      It is the intention of the parties to enter into a licensing agreement only and nothing herein contained shall be construed to regard the parties as being partners or joint venturers, or to constitute the arrangement herein provided for as a partnership or joint venture.

## INFRINGEMENT BY OTHERS

7.      Licensee shall notify Licensor of any such products or items of similar nature to the Licensed Product or any ancillary or related products which embody, in any way, the Mark, or any trademarks confusingly similar to the Mark which come to Licensee's attention. Licensor shall have the sole right to determine whether or not any action shall be taken against such infringement and Licensee shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of Licensor to do so. Licensor shall take action against such infringements at its own cost and expense.

## INDEMNITY

8.      (a)      Licensee agrees to indemnify and hold harmless Licensor against any and all claims, causes of action, suits, damages, liabilities, and/or judgments and settlements including all costs, expenses, and attorney's fees based upon and arising out of the Licensee's manufacture, distribution, promotion, and sale of the Licensed Product, or packaging, distribution, and/or advertising materials relating thereto. Licensee shall undertake to conduct the defense of any such suit at its own expense, it being understood, however, that Licensor has at all times the option to participate in, or undertake any litigation involving said matters through counsel of its own selection and at its own expense, subject to the indemnity and hold harmless obligations of Licensee hereunder with respect to such expense. Licensee shall not make any settlement of any claim, suit, or demand for which Licensor may become responsible hereunder without Licensor's written consent which shall not be unreasonably withheld. The indemnity, hold harmless, and defend provisions of this Agreement shall survive its termination or expiration.

(b)      Licensor agrees to indemnify and hold harmless Licensee against any and all claims, causes of action, suits, damages, liabilities and/or judgments and

settlements including all costs, expenses and attorney's fees based upon and arising out of or resulting from any actual or alleged trademark infringement made by third parties, and Licensor shall have the right to assume complete control of the defense of any such claim. Licensor shall further have the right to terminate this Agreement should termination be necessary to comply with a court order, or to settle, compromise or otherwise dispose of any such claim, demand or action for trademark infringement.

## INSURANCE

9.    Through the life of this Agreement Licensee shall maintain product liability insurance in the following amounts:

Comprehensive General Liability:

| | |
|---|---|
| Bodily Injury | $1,000,000 each person |
| | $1,000,000 each occurrence |
| Property Damage | $1,000,000 each occurrence |
| | $1,000,000 aggregate |
| Comprehensive Liability | $1,000,000 |

Licensee shall name Licensor as an additional insured under such policy. Alternatively, Licensor may be named as an additional insured under a policy of insurance maintained by Licensee's contract brewer meeting the same policy limits.

## TERMINATION

10.    (a)    In the event the Licensee shall at any time fail to make payments or otherwise abide by the conditions herein, Licensor shall have the right to notify Licensee of such default and its intention to terminate this Agreement unless such default is corrected by Licensee within sixty (60) days from the date of mailing of such notice. Licensor and Licensee shall, within ten (10) days of Licensee's receipt of such notice, discuss in good faith how such default might be cured, and such discussions shall include the possibility of extending the period in which such default shall be cured or modifying in a mutually satisfactory manner the requirements of the licensing arrangement. If the parties are unable to arrive at a mutually satisfactory solution, or if such default is not corrected within the aforementioned time period, or as such time period may be extended, Licensor shall be entitled, without prejudice to any of its other rights conferred by this Agreement, to terminate this Agreement at any time thereafter by sending a written notice of termination to Licensee to take effect immediately. Waiver by Licensor of any specific default or breach shall not be deemed to be a waiver of any other or subsequent default or breach.

(b)    In the event that Licensee shall become insolvent, exercise an assignment for the benefit of creditors, go into liquidation, or a trustee is appointed for the benefit of creditors, whether any of the aforesaid events be the outcome of a voluntary act of Licensee or otherwise, Licensor shall be entitled to terminate this Agreement forthwith by giving notice to such effect to Licensee.

(c)    The termination of this Agreement for any reason shall be without prejudice to any of each party's rights under this Agreement.

(d)    Notwithstanding termination of this Agreement, the parties shall be required to carry out any provisions hereof which contemplate performance by them subsequent to such termination and such termination shall not affect any liability or other obligations which shall have accrued prior to such termination, specifically including the payment of accrued royalties.

(e)    In the event of termination of this Agreement or upon its expiration according to the terms hereof, Licensee shall immediately discontinue all use of the Mark and all trademarks belonging to Licensor and all rights to use such trademarks shall automatically revert to Licensor and Licensee shall promptly execute any and all documents reasonably required by Licensor in connection with such discontinuance and reversion. Notwithstanding the foregoing, Licensee shall have the right to dispose of any then existing inventory of the Licensed Product during but not after the three (3) month period immediately following the date of such termination or expiration.

## ASSIGNMENTS

11.    This Agreement shall be binding upon and inure to the benefit of subsidiaries, affiliates, successors, and assigns of the parties hereto. This Agreement shall not be assigned or sublicensed by Licensee without the prior written consent of Licensor, except that the Agreement may be assigned as part of the sale of Licensee's entire company, or a controlling interest therein. In the event Licensee desires to sell its company or controlling interest therein, it shall first offer to sell such interest to Licensor. If after forty-five (45) days the parties have not concluded an agreement, Licensee may offer to sell such interest to a third party.

## GOVERNING LAW

12.    This Agreement shall be construed and governed in accordance with the laws of the State of New York.

## NOTICES

13.    All notices and payments provided for in this Agreement shall be given or made by personal delivery or by certified mail return receipt requested to the addresses set

forth above for each party to this Agreement, or to such other address as may be designated in writing by each party to the other from time to time. If given or made by personal delivery, notices and payments shall be effective on the date of personal delivery and, if given or made by certified mail return receipt requested, they shall be effective on the date of mailing unless otherwise provided herein.

## ENTIRE AGREEMENT

14.     This Agreement contains the entire understanding of the parties with respect to the subject matter herein contained. The parties may, from time to time during the continuance of this Agreement, modify, vary, or alter any of the provisions of this Agreement but only by an instrument duly executed by both parties hereto. All provisions of this Agreement shall be severable and no such provision shall be affected by the invalidity of any other provisions. This Agreement shall be interpreted and enforced as if all invalid provisions were not contained herein.

## AUTHORITY OF SIGNERS

15.     The individuals who sign this Agreement on behalf of the respective parties hereby represent and warrant that they have the right, power, legal capacity and appropriate corporate authority to enter this Agreement on behalf of the corporation or party for which they sign below.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date and year first written above.

**LICENSOR**
**The Stroh Brewery Company**

Date: 8/22/97

By: _____
Title: E.V.P - CFO

**LICENSEE**
**The Rheingold Brewing Company, LLC**

Date: 8/20/97

By: _____
Title: President

-8-

## EXHIBIT A

**RHEINGOLD (U.S. Trademark Registration No. 632,824
dated 8/14/56)**

**RHEINGOLD (U.S. Trademark Registration No. 320,606
dated 1/01/35)**

## ADDENDUM NO. 1 TO LICENSE AGREEMENT

THIS ADDENDUM NO. 1 effective the _____ 27 day of _August_, 1997 to the License Agreement, made and entered into on the _____ 22 day of _August_, 1997 by and between The Stroh Brewery Company ("Licensor") and The Rheingold Brewing Company, LLC ("Licensee") (the "License Agreement").

### WITNESSETH:

WHEREAS in connection with the License Agreement, the parties desire to add certain provisions regarding the keeping of books and accounts;

NOW THEREFORE, the parties further agree to the following, all other terms and conditions of the License Agreement remaining unchanged:

1.     Licensee shall keep accurate accounts and records of all transactions covered by this Agreement and shall allow Licensor, or its authorized representative, at Licensor's cost and no more than once every twelve (12) months, at reasonable business hours to examine all inventory, records, accounts or other documents in Licensee's possession relating to this Agreement in order to verify shipment quantities and resulting royalties due. Licensee agrees to retain its accounts and records of all transactions covered by this Agreement for at least four years beyond the current year to facilitate the resolution of any dispute in accounting.

All defined terms used herein shall have the meaning ascribed to them in the License Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be signed as of the date and year first written above.

LICENSOR

The Stroh Brewery Company

By: _____
Title: Exec VP

LICENSEE

The Rheingold Brewing Company, LLC

By: _Michael H. Mitaw_
Title: President

## AMENDMENT NO. 1 TO LICENSE AGREEMENT

This Amendment No. 1 is made and entered into this *13th* day of *JANUARY*, 1998, amending the License Agreement dated the 22nd day of August, 1997 by and between The Stroh Brewery Company ("Licensor") and Rheingold Brewing Company LLC ("Licensee"), (the "License Agreement").

1.     The third sentence of Section 2(a) shall be amended to read as follows:

"Should Licensee fail to sell a minimum of 2,000 barrels of the Licensed Product in calendar year 2000, or in any subsequent year, Licensor may, at its option, terminate this Agreement by written notice to Licensee within sixty (60) days of the end of said calendar year 2000 or in any other subsequent year."

2.     Section 5(d) shall be amended in its entirety to read as follows:

"Licensee shall produce the Licensed Product through a contract brewer.  Such contract brewer shall be a brewer qualified to produce the Licensed Product to the strict standards established for the Licensed Product. Licensor shall have the option to become the contract brewer for the Licensed Product, subject to the termination provisions of Licensee's existing production contract,  with Licensor's effective initial production date January 1, 2001 but no later than May 15, 2001 (the "Option to Brew"), subject to the following terms:

(1) Licensor shall provide Licensee written notice of its intent to exercise the Option to Brew by certified mail, return receipt requested, no later than July 31, 2000, accompanied by a contract production fee and charges quote as set forth in subsections (2) and (3) below. If Licensor fails to provide notice to Licensee of its intent to exercise the Option to Brew by July 31, 2000, Licensor's Option to Brew shall expire and no longer be enforceable. The notice of the intent to exercise the Option to Brew shall be subject to and contingent upon the agreement of the parties on a contract production fee and product charges;

(2) Licensor shall quote Licensee a contract production fee that is at a minimum ten percent (10%) below the brewing fee of Licensee's then current contract producer (the " Prior Brewing Fee");

(3) Licensor shall also quote product charges to Licensee which shall be no greater than the product charges for packaging materials, product ingredients, variable labor and variable overhead costs of Licensee's then current contract producer (the "Prior Product Charges");

(4) In order to determine that Licensor's contract production fee and product charges are within the cost parameters set forth above, within five (5) days of the date of the notice of Licensor's intent to exercise its Option to Brew, Licensor and Licensee shall each designate an unrelated third party quote evaluator (the "Evaluators") to review and confer as to Licensor's proffered brewing fee and product charges quotes. Without divulging to Licensor Licensee's Prior Brewing Fee and Prior Product Charges, the Evaluators shall advise Licensor if its quotes are within the given parameters. If Licensor is advised that its quotes are not within the given parameters, Licensor shall have up to four (4) opportunities to revise its quotes up or down until they are within the parameters. The parties agree to complete the quote evaluation process by no later than August 15, 2000.

In the event Licensor exercises its Option to Brew, Licensee shall transfer production of the Licensed Product in increments of not less than 50,000 barrels of volume on an annual basis unless Licensor agrees in writing to a lesser amount. To the extent Licensor is required to make any changes in its production facilities in order to brew the Licensed Product, Licensor shall bear the cost of such changes. At any time subsequent to receipt of Licensor's notice of its intent to exercise its Option to Brew, Licensee may nevertheless source all or any part of its production with another brewer, provided that Licensee shall pay Licensor sixty five cents ($0.65) per barrel royalty on all production not sourced with Licensor, such payment to commence with production on or after January 1, 2001 and such payment to be in addition to the royalties payable in Section 3 Royalty of this License Agreement. Notwithstanding the foregoing, should at any time Licensee become the owner or otherwise control a brewing facility, Licensee shall have the right to produce the Licensed Product at such brewery, for as long as Licensee continues to own or control the brewery, provided that should Licensee need to terminate any existing contract brewing agreement or arrangement with Licensor it shall do so in accordance with the terms and conditions of such agreement or arrangement. The sixty five cent ($0.65) per barrel royalty payable to Licensor shall not apply to product brewed in Licensee's own production facility."

3.    The second and third sentences of Section 11 shall be amended as follows:

"This Agreement shall not be assigned or sublicensed by Licensee without the prior written consent of Licensor, except that the Licensee may assign the Agreement without the prior written consent of the Licensor as part of the sale of (1) the Licensee's entire company, (2) all or substantially all of the company's assets, coupled with a dissolution of the company, or (3) a controlling interest in the company. In the event Licensee desires to sell pursuant to (1), (2) or (3) of this provision, Licensee shall first offer to sell such interests to Licensor."

All other terms and provisions of the License Agreement shall remain unchanged.

IN WITNESS WHEREOF, the parties have signed this Amendment No. 1 as of the date set forth above.

LICENSOR
The Stroh Brewery Company

By: _Mark J. Dunkiewicz_
Title: _V.P. Corporate Planning + Development_

LICENSEE
The Rheingold Brewing Company, LLC

By: _Michael Mitura_
Title: _President_

**EXHIBIT D**

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT dated as of October 27, 2005, by and between DRINKS AMERICAS HOLDINGS, LTD, a Delaware corporation ("Buyer"), and RHEINGOLD BREWING COMPANY, INC., a Delaware corporation ("Seller").

**WHEREAS,** Seller has been engaged in the business of manufacturing, marketing, distributing and selling beer products under the trademark "Rheingold" pursuant to the terms of the Rheingold License (as hereinafter defined); and

**WHEREAS,** Buyer is engaged through subsidiaries in the production, marketing, advertising, distribution and sale of spirits, wine, beer and non-alcoholic beverages, and Buyer will be engaged in the business of manufacturing, marketing, distributing and selling beer products; and

**WHEREAS,** Buyer desires to acquire from Seller, and Seller is willing to sell to Buyer, substantially all of Seller's assets, including, without limitation, all rights presently held by Seller to use the trademark associated with the Intellectual Property (as hereinafter defined) in the production, marketing, advertising, distribution and sale of beer products.

**NOW, THEREFORE,** the parties hereto, in consideration of the premises hereof and other good and valuable consideration, hereby agree as follows:

## I. DEFINITIONS

**1.1. Definitions.** The following terms used herein shall have the meanings given to such terms below.

"Acquired Assets" means, all assets of Seller, real and personal, tangible and intangible, including, without limitation, goodwill and those assets listed in Section 2.1 hereof.

"Assignment" means the assignment by Seller to Buyer of the licensee's interest in the Rheingold License.

"Assumed Contracts" means all of the executory leases, contracts and licenses listed on Schedule A attached hereto.

"Assumed Obligations" means (i) the obligations of Seller under the Assumed Contracts requiring performance on or after the Closing Date; and (ii) all obligations of Seller referred to in Schedule B hereof; provided, however, that the Assumed Obligations shall not include (x) any liabilities not specifically listed in said Schedule B, (y) any obligations of Seller to any of its employees, or (z) any taxes (including sales or transfer taxes) now or hereafter owed by Seller, or any affiliate or person related to Seller, regardless whether or not attributable to the Acquired Assets or the Business.

"Assumption" means the instrument pursuant to which Buyer shall assume the Assumed Obligations.

"Bill of Sale" means the bill of sale executed by Seller, transferring title to all the Acquired Assets to Buyer.

"Business" means Seller's business of manufacturing and selling beer products.

"Buyer" means Drinks Americas Holdings, Ltd., a Delaware corporation.

"Closing" means the Closing referred to in Section 5.1 hereof.

"Closing Date" means the date and time of the Closing.

"Common Stock" means shares of the Common Stock, par value $.001 per shares, of Buyer.

"Fixed Assets" means all Seller's fixed assets used in connection with the Business, including the machinery, equipment, spare parts and accessories, tools, dies, furniture, fixtures, office furnishings and other equipment.

"FMV" means fair market value of the Common Stock, determined as provided in Section 3.2 hereof.

"Intellectual Property" means all Seller's trade names, trade name rights, trademarks, trademark rights, logos, trade dress, licenses, patents, patent applications, patent rights, inventions (whether or not patentable), trade secrets, customer lists, copyrights (including registrations and applications therefore), technology, computer software source codes, know-how, processes, specifications, data and lab test results, formulas, projects in development, service marks, computer software, computer software modifications, enhancements and computer software derivative works, other intellectual property rights and other proprietary information, including all rights to, and intellectual property regarding, the "Miss Rheingold" promotional program.

"Inventory" means all inventory of Seller held for resale in connection with, or used to operate, the Business, including finished goods, raw materials, work-in-process, packaging, supplies and personal property and any prepaid deposits relating thereto on hand on the Closing Date, wherever located.

"Lien" means a lien, encumbrance, claim, security interest, mortgage, pledge, restriction, charge, instrument, license, encroachment, option, rights of recovery, judgment, order or decree of any court or foreign or domestic governmental entity, interest, product, tax (foreign, federal, state or local), in each case of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown and including all claims based on any theory that Buyer is a successor, transferee or continuation of Seller or the Business.

"Net Working Capital" means current assets minus current liabilities of Seller, determined in accordance with generally accepted accounting principles, consistently applied.

"Pabst" means Pabst Brewing Company, successor in interest to Stroh under the Rheingold License.

"Purchase Price" means the Purchase Price referred to in Section 3.1 hereof.

"Receivables" means all accounts receivable and notes receivable relating to the Business and outstanding at the Closing Date.

"Rheingold License" means the License Agreement dated August 22, 1997, as amended, by and between Stroh, as licensor, and Seller, as licensee, including (i) "Addendum No, 1" to License Agreement," dated August 27, 1997; (ii) "Amendment No. 1" to License Agreement dated January 13, 1998, and (iii) any other addendums, amendments, supplements or other agreement modifying the terms and conditions of the Rheingold License.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" means Rheingold Brewing Company, Inc., a Delaware corporation.

"Stroh" means The Stroh Brewery Company, an Arizona corporation.

"Tax Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

## II. PURCHASE AND SALE

**2.1. Acquired Assets.** Upon the terms and subject to the conditions set forth in this Agreement, at the Closing Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens, and Buyer shall purchase, acquire and take assignment and delivery of, all right, title and interest of Seller in and to the Acquired Assets, including the following:

(a) all Fixed Assets;

(b) all Intellectual Property;

(c) subject to Section 2.2 hereof, all inventory;

(d) subject to Section 2.2 hereof, all Receivables;

(e) all of Seller's contract rights with respect to the Acquired Assets and the Assumed Obligations;

(f) all computer software documentation, computer software source codes, computer software modifications and enhancements, computer software derivative works, all books and records, correspondence, customer lists, price lists, supplier lists, sales information, computer software and programs, if any (subject to the rights of third party licensors), and all advertising, packaging and promotional materials and files relating to the Acquired Assets or the Business;

(g) all goodwill, other intangible property and causes of action relating to the Acquired Assets or the Business;

(h) all licenses, certificates, permits and telephone numbers relating to the Business, to the extent the same are transferable;

(i) the Assumed Contracts;

(j) all current assets, including deposits, prepaid expenses and accounts receivable;

(k) all books and records relating to the Business and the Acquired Assets; and

(l) the right to use the name "Rheingold Brewing Co., Inc.," as the name of Buyer (or one of its operating subsidiaries) following the Closing as contemplated in Section 7.4 hereof.

**2.2. Assumed Obligations.** At the Closing, Buyer shall enter into the Assumption, pursuant to which Buyer shall assume the Assumed Obligations.

**2.3. Condition and Quality of Tangible and Intangible Personal Property.** Buyer acknowledges that it has fully and sufficiently inspected all items of tangible and intangible personal property which are the subject of this Agreement and agrees and acknowledges that, except for representations and warranties included herein, all such property will be sold by Seller and accepted by Buyer **"AS IS, WHERE IS"** with no representations or warranties of any nature, express or implied, on the part of Seller regarding the condition, quality or physical characteristics of such assets, including all warranties of merchantability and of fitness for any specific purpose.

### III. PURCHASE PRICE

**3.1. Amount.** The Purchase Price shall be the sum of (i) $1,000,000, payable in shares of Common Stock, (ii) $150,000 payable in cash, and (ii) the assumption by Buyer of the Assumed Obligations.

**3.2. Payment of Purchase Price.** The Purchase Price shall be paid by Buyer to Seller in two installments: (i) the first comprising shares of Common Stock having a FMV of $650,000 and assumption of the Assumed Liabilities, and (ii) the second comprising shares of Common

Stock having a FMV of $350,000 and cash in the amount of $150,000, the first such installment to be delivered at the Closing and, subject to the provisions of Section 7.7 hereof, the second such installment to be delivered at the first anniversary thereof. (Notwithstanding the foregoing, Buyer shall have the option to pay all or any portion of such second installment at any time prior to such first anniversary.) For the purposes hereof, the FMV of the Common Stock shall be determined as follows:

      (a) The FMV of shares of Common Stock to be delivered at the Closing shall be the average of the daily closing prices of such shares for each of the trading days during the period beginning on the day which is 90 calendar days prior to the Closing and ending on the trading day preceding the Closing; and

      (b) The FMV of shares of Common Stock at the first anniversary of the Closing shall be the average of the daily closing prices of such shares for each of the trading days during the period beginning on the day which is 90 calendar days prior to such anniversary, and ending on the trading day preceding such anniversary; provided, however, that Buyer shall have the right to elect to pay such second installment of the Purchase Price entirely in cash on said anniversary.

The closing price for each day referred to in subsection (a) or (b) above shall be the reported closing price of the Common Stock as reported on the OTC Bulletin Board ("OTCBB") of the National Association of Securities Dealers, Inc. or, in case no such closing price is reported on such day, the average of the closing bid and asked prices regular way for such day reported on the OTCBB or, on such principal national securities exchange on which the shares of the Common Stock shall be listed or admitted to trading, or if they are not listed or admitted to trading on any national securities exchange, but are traded in the over-the-counter market, the closing sale price of the shares of Common Stock or, in case no sale is publicly reported, the average of the representative closing bid and asked quotations for the shares of Common Stock on the National Association of Securities Dealers Automated Quotation ("NASDAQ") system or any comparable system, of if the Common Stock is not listed on the NASDAQ system or a comparable system, the closing sale price of the shares of Common Stock or, in case no sale is publicly reported, the average of the closing bid and asked prices as furnished by the National Quotation Bureau, incorporated, or if such organization is no longer in business, by such other source or sources as the Board of Directors ("Board") of the Company may reasonably select for that purpose.

3.3. Nonpayment/Insolvency. In the event that (i) Buyer defaults in its obligation hereunder to make the second installment of the Purchase Price, or (ii) prior to the one (1) year anniversary of the Closing, Buyer shall become insolvent, exercise an assignment for the benefit of creditors, go into liquidation, or a trustee is appointed for the benefit of creditors, then, subject to the provisions of the Rheingold License and any applicable laws and regulations, the Rheingold License shall be deemed reassigned from Buyer to Seller.

## IV. ASSUMPTION OF CONTRACTS AND LIABILITIES

**4.1. Assumption.** At the Closing, Buyer shall assume and agree to pay, perform, fulfill and discharge, and shall indemnify and hold Seller harmless from and against, (i) the Assumed Obligations, and (ii) the portions of the Purchase Price described in Section 3,2 hereof

**4.2. No Other Liabilities.** It is expressly agreed and understood that, except as provided in Sections 4.1 and 4.2 hereof, Buyer is not assuming any liability or obligation of Seller of any kind or nature whatsoever, whether accrued or unaccrued, contingent or noncontingent, material or nonmaterial, or known or unknown as of the Closing Date, including, without limitation, any liability or obligation (i) for taxes (including sales or transfer taxes) now or hereafter owed by Seller, or any affiliate or person related to Seller, or attributable to the Acquired Assets or the Business, and relating to any period, or any portion of any period, ending on or prior to the Closing Date or to the sale of the Acquired Assets to Buyer; (ii) under any contract or agreement other than the Assumed Contracts; (iii) accruing under the Assumed Contracts prior to the Closing Date; (iv) relating to or arising out of any product manufactured or sold, or service rendered, by Seller prior to the Closing Date; (v) relating to or arising out of the relationship between Seller and any employee or independent contractor, including workers compensation claims; (vi) for monies due to any third party; or (vii) relating to or arising out of the conduct or operation of the Business prior to the Closing Date. The transfer of the Acquired Assets pursuant to this Agreement shall be free and clear of all Liens.

## V. CLOSING

**5.1. Closing.** The closing of the sale and purchase of the Acquired Assets (the "Closing") shall be held at the offices of Rheingold Brewing Company, 130 West 42nd Street Suite 814 New York, NY 10036, and shall occur on or before (i) November 1, 2005, or (ii) such later date on which the parties hereto may agree, provided that all of the other conditions precedent set forth in Article VIII hereof have been satisfied or waived by the applicable party, and further provided that this Agreement has not been terminated pursuant hereto.

**5.2. Transactions at Closing.** At or before the Closing, each of the following shall occur:

(a) Seller shall deliver the Assignment;

(b) Seller shall duly execute and deliver to Buyer the Bill of Sale and such other certificates of title and other instruments of assignment or transfer with respect to the Acquired Assets, all in such form as is reasonably acceptable to Buyer's counsel, as Buyer may reasonably request and as may be necessary to vest in Buyer all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens;

(c) Buyer shall deliver to Seller the shares of Common Stock representing the first installment of the Purchase Price as provided in Section 3.2 hereof;

(d) Seller shall assume all expenses under real estate and equipment leases, to the extent such leases constitute Assumed Contracts. Buyer shall be responsible for the real estate lease hereunder effective October 1, 2005; and

(e) Buyer and Seller shall duly execute or deliver such certificates and documents (including officer's and secretary's certificates and certificates of good standing) and third party consents as may be required to effectuate the transactions contemplated by this Agreement or as may be reasonably requested by Buyer or Seller, as the case may be.

## VI. REPRESENTATIONS AND WARRANTIES

6.1. **Representations of Seller**. Seller represents and warrants to Buyer as follows:

(a) Organization. Seller, as of the Closing Date, will be a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, has all requisite power and authority to own and hold the Acquired Assets owned or held by it, to conduct the Business as currently conducted by Seller, and is duly licensed or qualified to do business in each jurisdiction in which the operation of the Business makes such licensing or qualification necessary;

(b) Authority. (i) Subject to obtaining the approval of stockholders, as required by Section 7.1 hereof, Seller shall have all requisite corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; (ii) Seller shall have obtained any necessary approvals for the execution and delivery of this Agreement and the consummation of the transaction contemplated hereby; and (iii) this Agreement shall have been duly executed and delivered by Seller and (assuming due authorization, execution and delivery by Buyer) shall constitute Seller's legal, valid and binding obligation, enforceable against it in accordance with its terms;

(c) Non-Contravention. Neither the execution and delivery of this Agreement by Seller nor the consummation by Seller of the transactions contemplated hereby shall constitute a violation of or be in conflict with, constitute or create a default under, or result in the creation or imposition of any Liens upon any property of Seller pursuant to (i) its certificate of incorporation or By-laws; (ii) any agreement or commitment to which Seller is a party or by which Seller or any of its properties are bound, or to which Seller is subject; or (iii) any law or statute or any judgment, decree, order, regulation or rule of any court or governmental or regulatory authority relating to Seller;

(d) Compliance with Laws. Seller has conducted and continues to conduct the Business so as to comply in all material respects with all laws and statutes and rules, regulations, judgments, orders or decrees of any court or governmental or regulatory authority applicable to Seller or any of its properties or assets, including the Acquired Assets and the Business, and Seller is not in violation of any such laws, statutes, rules, regulations, judgments, orders or decrees;

(e) Litigation. Except as set forth on Schedule 6.1(e) hereto, there are no actions, suits, proceedings or investigations pending or threatened, relating to or affecting the Business or the Acquired Assets, or which question the validity of this Agreement or challenge any of the transactions contemplated hereby or the use of the Acquired Assets or the conduct of the Business after the Closing by Buyer;

(f) Acquired Assets. Seller owns, and has the unrestricted right to transfer and assign to Buyer at the Closing, all right, title and interest in and to the Acquired Assets free and clear of all Liens;

(g) Assumed Contracts. Each of the Assumed Contracts is in full force and effect as of the date hereof. Seller has performed all obligations required to be performed by it and is not in default thereunder, and no event has occurred which, with the lapse of time and/or giving of notice, would constitute a default by Seller thereunder;

(h) Confidentiality. Seller has taken all commercially reasonable steps necessary to preserve the confidential nature of all material confidential information (including any proprietary information) with respect to the Business, Acquired Assets and Assumed Contracts;

(i) Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller;

(j) Fixed Assets. Schedule 6.1(j) hereto sets forth a true and complete list and description of the Fixed Assets, which include all of the manufacturing assets used in the operation of the Business;

(k) Intellectual Property. The Acquired Assets include, and Schedule 6.1 (k) hereto sets forth a true and complete list of, all Intellectual Property heretofore or currently used or required to be used in connection with the Business, including, without limitation, all rights to, and intellectual property regarding, the "Miss Rheingold" promotional program, To the best of Seller's knowledge, except as otherwise indicated on said Schedule, (i) all such Intellectual Property is owned by Seller and is not subject to any Lien, (ii) no product manufactured or sold, and no manufacturing process or Intellectual Property used by Seller in connection with the Business infringes or has infringed upon any intellectual property of others, and (iii) Seller has not received any notification or claim of infringement by Seller of any intellectual property from any person and is not aware of a basis for any such claim;

(1) Pabst Notice. Pabst has, pursuant to its contract rights to negotiate for and consummate the purchase of Seller or an interest therein as provided in Section 11 of the Rheingold License (the "Pabst Rights"), been given adequate, timely, and proper notice of the instant transaction, and has allowed the time frame within which to exercise its Pabst Rights to lapse, therefore permitting the instant transaction to proceed; and

(m) Securities Law Matters. Seller has determined that, except as shown on schedule 6.1(m) hereto, (i) each of its stockholders (the "Stockholders") meets the definition of an "accredited investor" contained in Section 5.03 of Regulation D promulgated by the SEC under the Securities Act, (ii) each of such Stockholders has acknowledged that the shares of Common Stock to be received upon. the dissolution of Seller will be "restricted securities" as defined in Rule 144 as promulgated by the SEC which may be sold only as provided in said Rule unless Buyer is satisfied that another exemption from the Securities Act is available, and (iii) Seller has provided its Stockholders with materials and information concerning Buyer and the transactions proposed to be carried out pursuant hereto, copies of which have been provided to Buyer, which materials and information do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were mad, not misleading.

6.2. **Representations of Buyer**. Buyer represents and warrants to Seller as follows:

(a) Binding Effect. This Agreement has been duly executed and delivered by Buyer and (assuming due execution and delivery by Seller) constitutes the legal, valid and binding obligation of Buyer and, enforceable against Buyer in accordance with its terms;

(b) Authorized Shares. Buyer has sufficient authorized but unissued shares of Common Stock available to deliver to Seller and to enable Seller to pay the Purchase Price for the Acquired Assets in accordance with the terms of this Agreement;

(c) Non-Contravention. Neither the execution and delivery of this Agreement by Buyer nor the consummation by Buyer of the transactions contemplated hereby shall constitute a violation of, or be in conflict with, constitute or create a default under, or result in the creation or imposition of any Liens upon any property of Buyer pursuant to (i) any agreement or commitment to which Buyer is a party or by which Buyer or any of its properties are bound, or to which Buyer is subject; or (ii) any law or statute or any judgment, decree, order, regulation or rule of any court or governmental or regulatory authority relating to Buyer;

(d) Governmental Consents. There are no consents, approvals or authorizations of, or registrations, qualifications or filings with, governmental or regulatory agencies or authorities necessary in connection with the execution and delivery of this Agreement by Buyer or for the consummation by Buyer of the transactions contemplated hereby;

(e) Litigation. There are no actions, suits, proceedings or investigations pending or threatened against either Buyer which question the validity of this Agreement or challenge any of the transactions contemplated hereby; and

(f) Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

(g) Compliance with Laws. Buyer has conducted and continues to conduct its business so as to comply in all material respects with all laws and statutes and rules, regulations, judgments, orders or decrees of any court or governmental or regulatory authority applicable to Buyer or any of its properties or assets, and Buyer is not in violation of any such laws, statutes, rules, regulations, judgments, orders or decrees.

## VII. COVENANTS

**7.1. Stockholder Approval.** Seller shall obtain the approval of its Stockholders to the entering into of this Agreement and performance of all the obligations of Seller contemplated hereby, and shall present to Buyer evidence thereof, not later than five business days following the execution hereof.

**7.2. Conduct of Business Prior to Closing.** Prior to the Closing, Seller shall continue to operate the Business only in the ordinary and usual course and consistent with Seller's past practices. Without limiting the generality of the foregoing, Seller shall use all commercially reasonable efforts and diligence (i) to preserve the business operations of Seller and the Business intact, (ii) to keep available the services of its current personnel, (iii) to preserve in full force and effect and to perform the contracts, agreements, instruments, leases, and licenses of Seller, and the arrangements and understandings of Seller, (iv) to preserve the goodwill of Seller's suppliers, customers, community and others having relations with Seller, (v) to continue in full force and effect all binders and policies of insurance of Seller and (vi) to continue its advertising and promotional activities, if any, and pricing and purchasing policies, in accordance with past practices.

7.3. Liability Concerning Unassumed Obligations. Following the Closing, Seller shall be solely responsible for the payment, settlement, or other disposition of all obligations of Seller not specifically being assumed by Buyer pursuant to this Agreement. Pursuant to such obligation, Seller shall indemnify and save harmless Buyer (and any of its officers, directors, or affiliates) from and against all liabilities, costs, damages, suits, or claims arising out of any matter arising out of any such unassumed obligation. The foregoing indemnification shall include, without limitation, the obligation to defend Buyer (or any of its officers, directors, or affiliates) in the event of any claim or suit arising out of any such unassumed obligation, and the prompt reimbursement or direct payment of any legal fees and disbursements incurred by Buyer (or any of its officers, directors, or affiliates) with its own counsel in dealing with or defending any claim by any holder of any such unassumed obligation.

7.4 Liability Concerning Assumed Obligations. Following the Closing, Buyer shall be solely responsible for the payment, settlement, or other disposition of all of the Assumed Obligations. Pursuant to such obligation, Buyer shall indemnify and hold harmless Seller (and any of its officers, directors, or affiliates) from and against all liabilities, costs, damages, suits, or claims arising out of any of the Assumed Obligations. The foregoing indemnification shall

include, without limitation, the obligation to defend Seller (or any of its officers, directors, or affiliates) in the event of any claim or suit arising out of an Assumed Obligation, and the prompt reimbursement or direct payment of any legal fees or disbursements incurred by Seller (or any of its officers, directors, or affiliates) with its own counsel in dealing with or defending any matter arising out of an Assumed Obligation.

    **7.5. Access.** From the date hereof until the Closing, upon reasonable notice, Seller shall, and shall cause its officers, directors, employees, agents and counsel to (i) afford the officers, employees, and authorized agents, accountants, counsel and financing sources and representatives of Buyer reasonable access, during normal business hours, to the offices, properties, other facilities, books and records of Seller and to those officers, directors, employees, agents, accountants and counsel of Seller who have knowledge relating to the Business, and (ii) furnish to the officers, employees and authorized agents, accountants, counsel, financing sources and representatives of Buyer such additional financial and operating data and other information regarding the Business and the Acquired Assets as Buyer from time to time may reasonably request.

    **7.6. Use of Corporate Name.** Seller agrees that, promptly following the Closing, it shall file a change of name certificate with the Secretary of State of Delaware, changing the corporate name of Seller to one not containing the word "Rheingold," and consents to Buyer, should Buyer so elect in its sole discretion, to establish a subsidiary to be called "Rheingold Brewing Company, Inc." or a variation thereof.

    **7.7. Retention of Records.** In order to facilitate the resolution of any claims made by or against or incurred by Buyer, for a period of three years after Closing, Seller shall (i) retain the books and records of Seller which are not transferred to Buyer pursuant to this Agreement relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller, and (ii) upon reasonable notice, afford the officers, employees and authorized agents and representatives of Buyer reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records.

    **7.8. Collection of Receivables.** In the event any payment for an account receivable is delivered to Seller or any affiliate of Seller after Closing, Seller shall, or shall cause its affiliate to, deliver such payment to Buyer promptly and in any event within ten days of receipt thereof.

    **7.9. Post-Closing Audit.** In the event that, within six months of the Closing, Buyer conducts a post-Closing accounting review and, as a result thereof, determines that the Company's Net Working Capital was less than the amount thereof required by Section 8.1(d) hereof, Buyer shall be entitled to deduct the aggregate of (i) any shortfall in Net Working Capital between the actual (as determined by such accounting review) and required amount thereof, from required FMV of the second installment of the Purchase Price; provided, however, that in the event that a dispute arises between Buyer and Seller as to any amount or amounts determined in such accounting review, Buyer and Seller shall each designate an accountant to resolve such dispute and such accountants shall endeavor to agree on the amounts in question, failing which such accountants shall agree on a third accountant, which is unaffiliated with either Buyer or any of Seller, who shall determine the amount or amounts in question.

**7.10. Covenants regarding Allocation of Purchase Price.** Prior to the Closing, the parties shall agree on an allocation of the Purchase Price among the acquired assets in a manner which complies with the requirements of the Tax Code. The parties agree that (i) the respective federal, state, local and foreign tax returns to be filed by each of them shall reflect such allocation, (ii) they shall cooperate in the preparation of such forms, and (iii) neither of them shall take any position contrary to such allocation in any tax return, in any refund claim, in any litigation, or otherwise, unless otherwise required to do so under applicable law.

## VIII. CONDITIONS OF CLOSING

**8.1. Conditions to Buyer's Obligations.** The obligation of Buyer to consummate the Closing shall be subject to the satisfaction at or prior to the Closing of each of the following conditions (to the extent noncompliance is not waived in writing by Buyer in Buyer's sole and absolute discretion), unless the failure of any such condition to 'be satisfied shall be the fault of Buyer:

(a) Representations. The representations and warranties made by Seller in or pursuant to this Agreement shall be true and correct in all material respects at and as of the Closing Date with the same effect as though such representations and warranties had been made or given at and as of the Closing Date;

(b) Compliance with Agreement. Seller shall have performed and complied in all material respects with all of its covenants and other obligations under this Agreement to be performed or complied with on or prior to the Closing Date;

(c) Compliance with the Law. No litigation shall be pending which purports to restrain or prevent the transactions contemplated by this Agreement, and Seller and Buyer shall have complied with all applicable requirements of statutes and governmental orders, regulations and rules relating to the transactions contemplated by this Agreement and the Closing hereunder;

(d) Net Working Capital. The Net Working Capital of Seller at the Closing Date shall not be less than ($9,000) ; and

(e)Stockholder Information. Seller shall have advised Buyer of the residences and numbers of shares of capital stock of Seller owned by each Stockholder to enable Buyer to prepare and file a Form D relating to the issuance of Common Stock contemplated hereby and to make such filings as may he required pursuant to the blue sky laws of the jurisdictions in which such Stockholders reside.

**8.2. Conditions to Seller's Obligations.** The obligation of Seller to consummate the Closing shall be subject to the satisfaction at or prior to the Closing of each of the following conditions (to the extent noncompliance is not waived in writing by Seller in Seller's sole and absolute discretion), unless the failure of any such condition to be satisfied shall be the fault of Seller:

(a) Representations. The representations and warranties made by Buyer in or pursuant to this Agreement shall be true in all material respects at and as of the Closing Date with the same effect as though made or given at and as of the Closing Date;

(b) Compliance with Agreement. Buyer shall have performed mid complied in all material respects with all of its covenants and other obligations under this Agreement to be performed or complied with at or prior to the Closing Date; and

(c) Compliance with the Law. No litigation shall be pending which purports to restrain or prevent the transactions contemplated by this Agreement, and Seller and Buyer shall have complied with all applicable requirements of statutes and governmental orders, regulations and rules relating to the transactions contemplated by this Agreement and the Closing hereunder.

## IX. TERMINATION

**9.1. Termination.** This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a) by mutual written consent of Buyer and Seller;

(b) by either Buyer or Seller if, without fault of the party seeking termination, the Closing shall not have occurred on or before December 31, 2005;

(c) by either Buyer or Seller if, without fault of the party seeking termination, any court of competent jurisdiction in the United States or any other United States governmental authority shall have issued an order, decree or ruling, or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby, and such order, decree, ruling or other action shall not have been reversed by a final and nonappealable order; or

(d) by either Buyer or Seller, if the other party hereto shall have materially breached the representations and warranties set forth in Article VI hereof or otherwise failed to perform any of its material covenants and agreements in this Agreement.

**9.2. Effect of Termination.** In the event of the termination of this Agreement pursuant to Section 8.1 hereof, (i) this Agreement shall forthwith become null and void and have no further force and effect, and (ii) neither of the parties hereto nor any of their respective directors, officers, stockholders, members, affiliates, representatives or advisors shall have any further obligation or liability under the provisions hereof.

## X. MISCELLANEOUS

**10.1. Risk of Loss.** Seller shall be responsible for any casualty loss to the Acquired Assets prior to the Closing. In the event of any such loss, Seller shall give written notice thereof to Buyer within one business day and, to the extent insurance proceeds are available to remedy such loss, Seller shall proceed to remedy such loss. If the loss is not remedied within 60 days after the occurrence thereof, regardless of the reason therefore, Buyer shall have the right to terminate this Agreement by giving written notice to Seller within five business days after the expiration of such 60-day period. If such notice is not given by Buyer within such five business day period, the Closing shall take place as provided herein, and the Purchase Price shall be appropriately adjusted to reflect such loss.

**10.2. Expenses.** All expenses of the preparation, execution and consummation of this Agreement and of the transactions contemplated hereby including the fees and disbursements of attorneys, accountants, and outside advisors, shall be borne by the party incurring such expenses. Any taxes in the nature of a sales, use and/or transfer tax imposed or payable in connection with the sale or transfer of the Acquired Assets shall be paid by Seller.

**10.3. Non-Agency.** Nothing in this Agreement shall be construed to constitute either party the agent of the other or to constitute the parties as members of a joint venture of partners, nor shall any similar relationship be deemed to exist between them.

**10.4. Severability.** If any provision of this Agreement shall be determined to be invalid or unenforceable by any arbitrators, any court of law or any government agencies, the remaining provisions shall be severable and enforceable in accordance with their terms so long as this Agreement without such invalid or unenforceable provision does not fail of its essential purpose or purposes. The parties shall negotiate in good faith to replace any such invalid or unenforceable provision or provisions with suitable provisions which shall maintain the economic purposes and intentions of this Agreement.

**10.5. Notices.** Any notice to be given hereunder shall be in writing and shall be deemed duly given (i) upon mailing a confirmation by first class mail, postage prepaid, of a facsimile or e-mail transmission, (ii) when sent by overnight delivery by courier, or (iii) when mailed by registered or certified mail return receipt requested and postage prepaid:

    (a) if to Seller, addressed to:
        Rheingold Brewing Company, Inc.
        130 West 42nd Street
        New York, NY 10036
        Attention: Mr. Norman E. Snyder

    With a copy to:

        Sanford G. Hausner, Esq.
        Buchanan Ingersoll PC
        1 Chase Manhattan Plaza
        New York, NY 10005

        (b) if to Buyer, addressed to:
               Drinks Americas Holdings, Ltd,
               372 Danbury Road
               Wilton, Connecticut 06897

               Attention: Mr. Patrick Kenny

       with a copy to:
               Fredrick Schulman, Esq.
               241 Fifth Avenue, Suite 302
               New York, New York 10016

or to such other address as either party hereto shall designate in writing to the other party.

**10.6. Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the parties hereto, whether written or oral, in connection therewith. No modification of any of the terms and conditions of this Agreement shall be valid unless contained in a written instrument signed by both parties hereto.

**10.7. Waiver.** A waiver by either party hereto of any particular default or breach by the other party shall not affect or prejudice the rights of the aggrieved party with respect to any other default or breach whether of the same or different nature.

**10.8. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed wholly within such State.

**10.9. Jurisdiction and Venue.** Each of the parties hereto hereby consents to the exclusive jurisdiction of the state or federal courts located in the Borough of Manhattan, New York, and agrees that any action concerning a dispute arising out of or relating to this Agreement shall be brought in any such court and that process, notice of motion, or other application of the court, or a judge thereof, or any notice in connection with the proceedings provided for herein may be served within or without the State of New York as provided herein for the serving of notices hereunder.

**10.10. Captions.** The captions heading each Article of this Agreement are for convenience only and shall have no effect on the interpretation on meaning of this Agreement.

**10.11. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

**10.12. Assigns.** This Agreement shall be binding upon and shall inure to the benefit of each of parties hereto and their respective successors and permitted assigns. Neither this Agreement, nor the obligations of any party hereunder, shall be assignable or transferable by any such party without the prior written consent of the other party hereto; provided., however, Buyer shall have the right to assign its rights and obligations hereunder to an affiliate of Buyer without the prior written consent of Seller so long as Buyer remains liable hereunder as if no assignment had occurred.

**10.13. Surviving Provisions.** Upon the expiration or termination of this Agreement, each of Buyer's and Seller's obligations under Section 8 hereof and such other provisions hereof which by their terms are not clearly intended to expire upon such expiration or termination or at a specified time thereafter, shall survive such expiration or termination or lapse of such specified time.

**10.14. Specific Performance.** The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity without the necessity of demonstration of inadequacy of monetary damages

**IN WITNESS WHEREOF,** each of the parties hereto have caused this Agreement to be duly executed and delivered by its respective duly authorized representative as of the date and year set forth above.

Buyer:
DRINKS AMERICAS HOLDINGS, LTD.

By: _____

Seller:
RHEINGOLD BREWING COMPANY, INC,

By: _____
    NORMAN E. SNYDER
    CFO

## ASSET PURCHASE AGREEMENT

### <u>Schedule A</u>
### <u>Assumed Contracts</u>

Pabst License Agreement

FX Matt Production Agreement

Premier Beverage Distributing Agreement

Adirondack Wholesale Agreement

Giant Step Agreement

Coney Island USA Agreement

Ryan LLC Lease (rent)

Tiger Leasing (office furniture and phones)

Canon Business Solutions (printer lease)

Intellispace (internet access)

# ASSET PURCHASE AGREEMENT

### Schedule B
### Assumed Obligations

| Vendor | Amount |
|---|---|
| FX Matt | $30,389.82 |
| Manhattan Beer Distributors | $23,102.22 |
| Pabst Brewing Company | $6,613.25 |
| Micro Star | $3,192.75 |
| Ryan LLC | $7,648.33 |
| Giant Step | $45,000.00 |
| Fine Products | $30,000.00 |
| Coney Island USA | $6,000.00 |
| Joseph Owades | $8,350.00 |
| Renotech | $5,586.28 |
| Commercial Distributors | $364.60 |
| Drinx Unlimited | $186.67 |
| F&F Distributors | $243.20 |
| LA Piccirillo | $1,243.00 |
| Mincolla Distributing | $66.90 |
| Premier Distributors | $1,839.15 |
| Franklin Distributors | $119.87 |
| Suffolk County Vol. FF Burn Ctr. | $500.00 |
| **Total** | **$170,446.04** |